## In the
# United States Court of Appeals
## For the Seventh Circuit

―――――――――

No. 05-2495

TERRANCE BERGER and DONALD LAXTON,

*Plaintiffs-Appellants,*

*v.*

AXA NETWORK LLC and EQUITABLE LIFE
ASSURANCE SOCIETY OF THE UNITED STATES,

*Defendants-Appellees.*

―――――――――

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 03 C 125—**Elaine E. Bucklo**, *Judge.*

―――――――――

ARGUED FEBRUARY 14, 2006—DECIDED AUGUST 18, 2006

―――――――――

Before BAUER, RIPPLE and WILLIAMS, *Circuit Judges.*

RIPPLE, *Circuit Judge.* Section 510 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1140, prevents employers from altering their workers' employment status for the purpose of interfering with rights under an ERISA-qualified benefit plan. The named plaintiffs in this class action, two insurance salesmen, have invoked § 510 against their employers, AXA Network LLC and the Equitable Life Assurance Society of the United States (collectively, "AXA"). They allege that AXA intentionally

deprived them of benefits by changing the way that insurance salesmen are defined as full-time employees of the company. The district court awarded summary judgment to AXA on the ground that the limitation period applicable to the plaintiffs' claim had expired; it ruled alternatively that the plaintiffs' assertions failed as a matter of law. We agree with the district court that the plaintiffs' claim is time-barred. Accordingly, we affirm the judgment of the district court on that ground and find it unnecessary to reach the merits.

# I

# BACKGROUND

## A. Facts

In this de novo review of the district court's grant of summary judgment to AXA, we must construe the facts in a manner that resolves all reasonable inferences in the non-movant's favor. *See Scaife v. Cook County*, 446 F.3d 735, 738-39 (7th Cir. 2006). Indeed, there is little dispute concerning the basic facts. The defendants in this action, AXA Network LLC and the Equitable Life Assurance Society of the United States—to whom we refer collectively as "AXA"—are insurance brokerage subsidiaries of the France-based AXA Financial, Inc. Both subsidiaries are headquartered in New York City and provide the same pension and welfare benefits to their employees, agents and managers through a number of ERISA-qualified plans. AXA maintains a network of agency offices throughout the United States. Each satellite office employs a staff of insurance salesmen who work locally, selling policies to customers in their region. The lead plaintiffs in this action, Terrance Berger and Donald Laxton, are Illinois residents who signed on as

insurance salesmen with a local AXA office near Chicago in the early 1980s. After having worked for the company for three years, each entered into an agreement with AXA known as the "14th Edition" contract that permitted them to sell AXA policies as independent contractors.

AXA insurance salesmen, despite being independent contractors, were able to participate in the company's ERISA-qualified plans. To become eligible, they had to be considered an "employee" under the Internal Revenue Code, which includes "full-time life insurance salesman" within the definition of "employee." 26 U.S.C. § 3121(d)(3)(B). An IRS regulation, in turn, defines a "full-time insurance salesman" as an individual "whose entire or principal activity is devoted to the solicitation of life insurance or annuity contracts, or both, primarily for one life insurance company." 26 C.F.R. § 31.3121(d)-1(d)(3)(ii). This definition is a default; the employer and employee may choose to redefine "full-time" status via contract, so long as they act reasonably. *See* Brian E. Gates, Internal Revenue Manual § 4.23.5-3 (2005).

At the time that the plaintiffs entered into their 14th Edition contracts with AXA, the company employed essentially an "honor system" to qualify salesmen as full-time agents. Under this system, salesmen were asked, upon contracting with AXA, to complete a FICA form indicating whether they intended to devote their principal business activity to the solicitation of life insurance or annuity policies for AXA. Assuming they answered affirmatively, AXA then applied a presumption that agents who had submitted an appropriate FICA form were statutory employees. When Mr. Berger and Mr. Laxton entered into 14th Edition contracts with AXA, both indicated on their FICA forms that they intended to devote their principal business

activity to selling AXA policies. AXA then relied on these representations to qualify them as full-time agents and to allow them to participate in AXA's ERISA-qualified plans.

In the mid-1990s, senior management at AXA began recommending that the company do away with the "honor system" and no longer accept a salesman's representation that he was committed to selling AXA policies full-time. Instead, management proposed a new policy that tied statutory employee status to an objective measure of annual insurance sales. The idea was that this objective formula more accurately measured the agents' intent to devote their principal business activity to selling AXA policies. The proposal was adopted, and AXA announced that, starting January 1, 1999, agents under 14th Edition contracts who failed to meet a specified sales goal during the preceding year no longer would be considered statutory employees. The plaintiffs were alerted to this policy change by letters from AXA headquarters, dated February 6, 1998. In 1999, Mr. Berger failed to meet the new annual sales threshold and lost his status as a statutory employee. Mr. Laxton met the same fate the following year. As a result, they were no longer eligible to participate in AXA's benefit plans. From 1999 to 2004, several thousand other AXA agents lost full-time status and plan eligibility as a result of the change in policy.

### B. District Court Proceedings

On January 7, 2003, Mr. Berger and Mr. Laxton filed a three-count complaint alleging that AXA's 1999 change in the way it classified agents violated § 510 of ERISA, *see* 29

U.S.C. § 1140.[1] In 2004, the district court granted the plaintiffs' motion for certification of a class consisting of the thousands of other insurance agents who had been reclassified by AXA and denied eligibility for benefits.

AXA then moved for summary judgment, asking the court to dismiss the class action on the ground that the plaintiffs' claims were time-barred or, alternatively, on the ground that they failed as a matter of law. The district court granted the motion. Because § 510 lacks a statute of limitations, the court borrowed a limitations period from the law of New York, the state that, in its view, had the most significant relationship to the dispute. The court determined that the most analogous claim for relief under New York law is a claim for retaliatory discharge under the state's workers' compensation law; New York law bars such claims after two years, *see* N.Y. Work. Comp. Law § 120. The court then rejected the plaintiffs' theory that each yearly denial of full-time status started the limitations clock anew. The court held that the plaintiffs' claims accrued in 1998, when they first learned of AXA's decision to change the way it classified insurance salesmen, or, at the latest, when the policy became effective in January 1999. In either case, the plaintiffs' failure to institute this action until January 7, 2003, barred their claim under the applicable two-year statute of limitations.

The district court held, alternatively, that the plaintiffs' grievance under § 510 failed as a matter of law. That section, which is designed to protect the employment relationship from being changed in ways intended to deny benefits, did not, according to the court, apply to the present dispute. In

---

[1] Only the ERISA count survived a motion to dismiss. The other allegations are not before us in this appeal.

the court's view, the employment relationship between AXA and its salesmen had not been altered by the 1999 change in policy. What had changed was that, instead of taking an agent's word that he was committed to selling AXA policies full-time, AXA had chosen to employ a concrete sales calculus in order to make the full-time determination objective. This change, the district court concluded, did not offend § 510.

## II

## DISCUSSION

We first address whether the district court correctly determined the appropriate limitations period for an action under § 510 of ERISA, *see* 29 U.S.C. § 1140. In examining this problem, we must confront several difficult methodological issues that have "spawned a vast amount of litigation" and "uncertainty for both plaintiffs and defendants." *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 377, 379 (2004).

## A.

In enacting ERISA, Congress supplied an express limitations period for several parts of the statute;[2] it did not,

---

[2] For instance, claims under Part 4 of ERISA, the sections governing plan fiduciaries, expire within six years or three years, depending on when the plaintiff knows or should know of the fiduciary's breach. *See* 29 U.S.C. § 1113. Similarly, actions under Subtitle E, the special provisions for multiemployer plans, *id.* §§ 1381-1453, must be brought within six years from when they arose or three years from when the underlying actions were
(continued...)

however, provide one for actions grounded in § 510.[3] Section 510 also was enacted too early to permit us to apply the default four-year federal limitations period contained in 28 U.S.C. § 1658(a). That statute functions as a catch-all limitations period for federal causes of action that do not have their own limitations periods.[4] The catch-all, however, applies only to those causes of action created after 1990. Although the Supreme Court has held that, under certain circumstances, a new amendment to an older federal statute

---

[2] (...continued)
discovered. However, § 510, *id.* § 1140, was codified in Part 5 of ERISA, "Administration and Enforcement," to which the statute of limitations in § 1113 expressly does not apply.

[3] *See Tolle v. Carroll Touch, Inc.*, 977 F.2d 1129, 1137 (7th Cir. 1992) ("Congress did not provide a statute of limitations for claims premised upon Section 510 of ERISA."). We note, additionally, that it is not uncommon for Congress to omit limitations periods from federal statutes. *See, e.g., Goodman v. Lukens Steel Co.*, 482 U.S. 656, 660-61 (1987) (discussing the omission in 42 U.S.C. § 1981); *Wilson v. Garcia*, 471 U.S. 261, 266-67 (1985) (discussing the omission in 42 U.S.C. § 1983).

[4] Section 1658(a) was a response to the host of "practical problems" that arise from the practice of borrowing state statutes of limitations to fill gaps in federal statutes. As the House Report to § 1658(a) described, reliance on analogous state statutes

> obligates judges and lawyers to determine the most analo-
> gous state law claim; it imposes uncertainty on litigants;
> reliance on varying state laws results in undesirable variance
> among the federal courts and disrupts the development of
> federal doctrine on the suspension of limitation periods.

H.R. Rep. No. 101-734, at 24 (1990), *as reprinted in* 1990 U.S.C.C.A.N. 6860, 6870.

can trigger § 1658(a), *see Jones*, 541 U.S. at 382, § 510 of
ERISA has not been amended since its original enactment in
1974.

Because Congress has failed to provide any statutory
direction, our inquiry must be guided by principles of
federal common law. The basic approach is well-settled.
When Congress fails to provide a statute of limitations for
a federal claim and § 1658(a) is not applicable, federal courts
must borrow the most analogous statute of limitations from
state law. *See Reed v. United Transp. Union*, 488 U.S. 319, 323
(1989); *Teumer v. Gen. Motors Corp.*, 34 F.3d 542, 546-47 (7th
Cir. 1994). The Supreme Court has recognized a limited
exception to this general rule:

> We decline to borrow a state statute of limitations only
> when a rule from elsewhere in federal law clearly
> provides a closer analogy than available state statutes,
> and when the federal policies at stake and the
> practicalities of litigation make that rule a significantly
> more appropriate vehicle for interstitial lawmaking.

*Reed*, 488 U.S. at 324 (internal quotation marks omitted). The
Supreme Court also has made clear, however, that this
exception is "a closely circumscribed[,] . . . narrow exception
to the general rule," *id*. at 324, and that state law remains the
"lender of first resort," *N. Star Steel Co. v. Thomas*, 515 U.S.
29, 34 (1995). In any event, borrowing directly from federal
law in this case is foreclosed by our prior cases. *See, e.g.,
Teumer*, 34 F.3d at 546-47 (applying a state limitations period
to a claim under § 510); *Tolle v. Carroll Touch, Inc.*, 977 F.2d
1129, 1137 (7th Cir. 1992) (same).

In *Teumer*, we held that "the five-year statute of limita-
tions governing retaliatory discharge claims in Illinois
should apply to all § 510 actions in which Illinois limitations

law is to be borrowed." *Teumer*, 34 F.3d at 550. However, in *Teumer*, we did not have to choose between the law of Illinois and the law of another state in borrowing a state statute of limitations.[5] In the present case, by contrast, the parties dispute whether Illinois or New York law ought to supply the limitations period. Illinois is the forum state and home to the named plaintiffs in this class action. New York, on the other hand, is the location of AXA's headquarters, where the plan is administered and where the decisions at issue in this case were made. It is also the state whose substantive law is, by the terms of the plan, applicable to disputes arising under that contract.

In order to determine whether Illinois or New York law ought to supply the limitations period, we first must identify a choice of law rule or methodology that will permit our determination to be a principled one. The Supreme Court has not set forth a definitive choice of law formula to govern the selection of a limitations period. *See Auto Workers v. Hoosier Cardinal Corp.*, 383 U.S. 696, 705 n.8 (1966) (reserving the question).[6] However, its rulings on related issues

---

[5] *See Teumer v. Gen. Motors Corp.*, 34 F.3d 542, 547 (7th Cir. 1994) ("Because Illinois is both the forum state and the state in which the significant events of this case took place, we will refer to its law without resolving the difficult question of what is the proper choice-of-law rule when selecting state limitation periods for federal claims.").

[6] We do not believe that the Supreme Court decided this issue by implication in *North Star Steel Co. v. Thomas*, 515 U.S. 29 (1995), although one of our sister circuits appears to have thought otherwise, *see Int'l Union, United Plant Guard Workers of America v. Johnson Controls World Servs.*, 199 F.3d 903, 905 (11th Cir. 1996).

(continued...)

and the experience of our sister circuits provide helpful guidance.

**B.**

We begin our journey with a principle upon which there is no real disagreement: In fashioning a choice of law rule to govern our quest for the most appropriate state limitations period, our task, when the underlying claim is a *federal* claim, is to fashion a *federal* choice of law rule.[7] This principle is really nothing more than a corollary principle to the more general maxim that, when state law is borrowed in a *federal* question suit, the choice of "which [state] law to select is itself a question of *federal* law." *Resolution Trust*

---

[6] (...continued)
As recently as last Term, the Supreme Court recognized that this issue has yet to be resolved. *See Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 378 (2004) ("The practice of borrowing state statutes of limitation also forced courts to address the frequently present problem of a conflict of laws in determining which State statute was controlling, the law of the forum or that of the situs of the injury." (internal quotation marks and alterations omitted)).

[7] *See, e.g., Wang Labs., Inc. v. Kagan*, 990 F.2d 1126, 1128 (9th Cir. 1993) ("We decide as a matter of federal law which state statute of limitations is appropriate."); *Gluck v. Unisys Corp.*, 960 F.2d 1168, 1179 (3d Cir. 1992) ("If a statute of limitations of a state other than the forum state were implicated in the litigation of a federal claim, then federal, not state, choice of law principles would govern."); *Champion Int'l Corp. v. United Paperworkers Int'l Union*, 779 F.2d 328, 332-34 (6th Cir. 1985) (holding that federal law, rather than a state borrowing statute, should govern the choice between the forum state's statute of limitations and that of another state in an action under the federal labor laws).

*Corp. v. Chapman*, 29 F.3d 1120, 1124 (7th Cir. 1994) (citation omitted) (emphasis added). In *Chapman,* we explained:

> What law Illinois courts would choose is . . . irrelevant. This is not a diversity case, where *Erie* would require the forum court to apply the whole law of the state, including its choice of law principles. *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 61 S. Ct. 1020, 85 L.Ed. 1477 (1941). It is a suit by a federal agency invoking federal jurisdiction per 12 U.S.C. § 1441a(*l*)(1), which says that suits to which the [Resolution Trust Corp.] is a party "shall be deemed to arise under the laws of the United States". Federal law may well look to state law for substantive principles, *see United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 727-29, 99 S. Ct. 1448, 59 L.Ed.2d 711 (1979), but which law to select is itself a question of federal law, as *Kimbell Foods and O'Melveny & Myers* [*v. FDIC*, 512 U.S. 79, 114 S. Ct. 2048, 129 L.Ed.2d 67 (1994),] show. The Supreme Court in *O'Melveny & Myers* did not ask what law a state court would have selected; it approached the question as one for independent decision.

*Id.*[8]

This general principle is easily applicable to the borrowing of a state statute of limitations to fill a gap left open in a *federal* statute. Unlike when our jurisdiction is based on diversity of citizenship, the exercise of federal question

---

[8] Subsequently, the primary holding of *Chapman* was overruled by the Supreme Court in *Atherton v. FDIC*, 519 U.S. 213 (1997). We later recognized that *Chapman*'s "ruling on choice-of-law, however, presumably remains controlling precedent." *FDIC v. Wabick*, 335 F.3d 620, 625 n.2 (7th Cir. 2003).

jurisdiction does not implicate concerns of federalism and interstate comity. "State legislatures do not devise their limitations periods with national interests in mind." *Reed*, 488 U.S. at 324 (internal quotation marks omitted); *Gluck v. Unisys Corp.*, 960 F.2d 1168, 1179 n.8 (3d Cir. 1992) ("A state court or legislature does not necessarily seek to further or even consider federal laws when it develops its choice of law provisions."). In federal question cases, we must ensure only that the borrowed limitations period is compatible with the purpose of the federal statute. In view of this general principle, we now must evaluate several possible methodologies for determining *which* state's law should apply.

One possible approach would be simply to choose, in every case, the forum state's law as the source of the applicable limitations period. The prime advantage of this approach is its simplicity; neither the court nor the parties remain in doubt concerning which state's law ought to apply. Certainly, predictability and ease of administration are factors long recognized in the fashioning of any choice of law tool. *See* Restatement (Second) of Conflict of Laws § 6(2).[9]

This approach is not without disadvantages, however. The selected limitations period, drawn in rote fashion from the forum state's law, may have only a limited relationship to the federal cause of action and its underlying policies. When a state, either by statute or by case law, makes a certain limitations period applicable to a particular state cause of action, a conscious decision is made that the public policy of the state ought to permit suit on that state-created cause of action only for the length of time permitted by that limitations period. Whatever the reasons for the state's policy on

---

[9]  *See infra* note 14.

how long a state cause of action ought to remain alive, those policy concerns may not have much relevance to the congressional policies that animate a federal cause of action in the district court under the court's federal question jurisdiction. *See Reed*, 488 U.S. at 324; *Gluck*, 960 F.2d at 1179 n.8.

The force of this criticism partially is assuaged, no doubt, by the fact that the state limitations period is linked to a state cause of action that at least somewhat resembles the federal cause of action. Here, for instance, the state limitations period typically borrowed in § 510 actions is the one that applies to the state cause of action for retaliatory discharge, a cause of action that embodies at least some of the same protective policy concerns that are contained in § 510. *See Teumer*, 34 F.3d 547 (noting that § 510 protects workers against "the disruption of employment privileges to punish (i.e. retaliate for) the exercise of benefit rights" (emphasis omitted)).

Nevertheless, we must conclude that the automatic application of the forum state's statute of limitations does risk endangering federal policies by displacing them in favor of state concerns that are driven by local geographical factors or local interests and that are different from or even inimical to national policy interests. "Federal law is no judicial chameleon, changing complexion to match that of each state wherever lawsuits happen to be commenced." *D'Oench, Duhme & Co. v. FDIC*, 315 U.S. 447, 471-72 (1942) (Jackson, J., concurring).

A second possible approach is to fashion a choice of law rule as a matter of federal common law by relying on the approach to statutes of limitations set forth in the Restatement (Second) of Conflict of Laws. *See Held v. Mfrs. Hanover*

*Leasing Corp.*, 912 F.2d 1197, 1202 (10th Cir. 1990) (discussing this approach). The Restatement has a special section devoted to the selection of an appropriate statute of limitations: Section 142.[10] This section was revised in 1988 to reflect "the emerging trend" in the way courts were approaching limitations questions. *See Reinke v. Boden*, 45 F.3d 166, 168-69 (7th Cir. 1995). The comments to the revision observed that, in the period after the adoption of the Second Restatement in 1971, many courts had ceased to "characterize the issue of limitations as ipso facto procedural and hence governed by the law of the forum." Restatement (Second) of Conflict of Laws § 142 cmt. e.[11] Instead, these courts had decided that a claim should not be maintained

---

[10] Section 142 provides:

Whether a claim will be maintained against the defense of the statute of limitations is determined under the principles stated in § 6. In general, unless the exceptional circumstances of the case make such a result unreasonable:

(1) The forum will apply its own statute of limitations barring the claim.

(2) The forum will apply its own statute of limitations permitting the claim unless:

(a) maintenance of the claim would serve no substantial interest of the forum; and

(b) the claim would be barred under the statute of limitations of a state having a more significant relationship to the parties and the occurrence.

Restatement (Second) of Conflict of Laws § 142.

[11] *See also Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 778 (1984) ("There has been considerable academic criticism of the rule that permits a forum State to apply its own statute of limitations regardless of the significance of contacts between the forum State and the litigation.").

"if it is barred by the statute of limitations of the state which, with respect to the issue of limitations, is the state of the most significant relationship to the occurrence and the parties." *Id.* As revised, section 142 resolves limitations conflicts through the Restatement's general, multi-factor "interest analysis," *id.* § 6(2),[12] despite retaining "a decided forum bias." Eugene F. Scoles et al., Conflict of Laws 130 (4th ed. 2004).

Application of the Restatement approach to the task before us requires a significant amount of prudence and caution. Full-scale implementation of the Restatement would amount to using a tool created for one task to accomplish another. Section 142 provides that, if the forum has a longer statute of limitations that would permit the claim, the longer period should apply unless there is no "substantial" forum interest and the "state having a more significant relationship to the parties and the occurrence"

---

[12] Section 6(2) states that

> the factors relevant to the choice of the applicable rule of law include
>
> > (a) the needs of the interstate and international systems,
> >
> > (b) the relevant policies of the forum,
> >
> > (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
> >
> > (d) the protection of justified expectations,
> >
> > (e) the basic policies underlying the particular field of law,
> >
> > (f) certainty, predictability and uniformity of result, and
> >
> > (g) ease in the determination and application of the law to be applied.

Restatement (Second) of Conflict of Laws § 6(2).

would bar the claim. Restatement (Second) of Conflict of Laws § 142(2)(a), (b). This task of accommodating the interests of two states is, of course, not the appropriate focus of the judicial inquiry in the task before us. Our task is not to reconcile the competing interests of Illinois and New York but to identify the state statute of limitations that is most compatible with the underlying policies of the federal cause of action before us, ERISA § 510. From this perspective, Restatement § 142 is a helpful tool in our task only insofar as it counsels that the appropriate statute of limitations, in certain cases, may not be that of the jurisdiction in which the court sits, but rather one from another jurisdiction that has a more significant relationship with the parties and with the transaction.

Our examination of these two approaches convinces us that neither is a totally effective tool in identifying the appropriate statute of limitations for a claim based on federal law. Total adherence to forum law would provide a great deal of certainty and avoid a "trial within a trial" on the statute of limitations issue. Certainly, " '[f]ew areas of the law stand in greater need of firmly defined, easily applied rules than does the subject of periods of limitations.' " *Wilson v. Garcia*, 471 U.S. 261, 266 (1985) (quoting *Chardon v. Fumero Soto,* 462 U.S. 650, 667 (1983) (Rehnquist, J., dissenting)). There will be occasions, however, when the statute of limitations of another state ought to be applied—not because that state has a greater interest in the application of its own law as opposed to the law of the forum—but because application of that state's law is more consistent with the federal policies embodied in the substantive federal statute. *See Gluck,* 960 F.2d at 1179 & n.8.

Because both of the methodologies that we have outlined are tools created for other tasks, some of our sister

circuits have suggested a third approach. Under this approach, a federal court selects a statute of limitations from the forum state's law unless another state has more significant contacts with the dispute.[13] This approach gives adequate, indeed great, weight to the concerns of predictability, certainty and ease of administration. It also ensures at least some minimum congruence between the policy concerns underlying the federal cause of action and those underlying the state cause of action from which the limitations period is borrowed.

We believe that this approach has significant merit. However, the congruence may be truly minimal, and therefore we hesitate to characterize forum law as the "presumptive" choice. In our view, it is preferable to refer to the forum's limitations period instead as a starting point. If another state with a significant connection to the parties and to the transaction has a limitations period that is more compatible with the federal policies underlying the federal cause of action, that state's limitations law ought to be employed because it furthers, more than any other option, the intent of Congress when it created the underlying right.

## C.

We now must apply this approach to the case before us. In our view, New York is the state with the most significant relationship to the parties and to the transaction. The occurrence at issue here was the corporate decision on the part of AXA to alter the criterion for determining wheth-

---

[13] The Third and Ninth Circuits have employed this approach. *See Wang Labs.*, 990 F.2d at 1128; *Gluck*, 960 F.2d at 1179.

er an employee ought to be considered a full-time insurance salesman. That change was made by AXA management in New York and documented by evidence and by witnesses in New York. Moreover, the decision was applicable to all AXA's salesmen, not simply to those in Illinois. Although the named plaintiffs reside in Illinois, other members of the class reside in states other than Illinois. Thus, Illinois is simply a spoke rather than the hub of this lawsuit.[14] Additionally, although not dispositive to our decision today, it is not entirely irrelevant that the plan chose New York law to govern non-ERISA disputes arising out of the document. Although the choice of law clause does not apply directly to the problem before us,[15] its presence serves as strong

---

[14] *Cf.* Restatement (Second) Conflict of Laws § 192 cmt. h (noting that, with respect to group life insurance policies, rights against the insurer are usually governed by the law that governs the master policy (usually the place of the corporate headquarters) because it is "desirable that each individual insured should enjoy the same privileges and protections").

[15] The plan's choice-of-law provision cannot control our inquiry for two reasons. First, it would be against the weight of precedent to apply a broad choice-of-law provision to limitations issues where, as here, the provision does not extend expressly to statutes of limitations, *see* R.68-1, Ex.25 at 279 ("To the extent ERISA is not applicable or does not preempt state law, the laws of the State of New York shall govern."). *See Cole v. Mileti*, 133 F.3d 433, 437-38 (6th Cir. 1998); *Gluck*, 960 F.2d at 1179; *Trs. Operative Plasterers' & Cement Masons' Local Union Officers & Employees Pension Fund v. Journeymen Plasterers' Protective & Benevolent Soc'y, Local Union No. 5*, 794 F.2d 1217, 1221 (7th Cir. 1986). Second, the plaintiffs' claim does not arise out of the plan itself. Rather, it is an action for interference with the employment status of the salesmen that in turn ends up denying

(continued...)

evidence of the parties' "justified expectations," *see* Restatement (Second) of Conflict of Laws § 6(2), that New York law would fill in the necessary gaps in federal ERISA law.

We recognize, of course, that Illinois, as the forum state and home to the named plaintiffs, has some connection with this action. Indeed, the comments to Restatement § 142 recognize that, at least in state court litigation, the decision of which state's law to apply "becomes difficult in situations where, although the forum is not the state of the most significant relationship to important issues in the case, some forum interest would be served by entertainment of the claim," as, for example, "where the domicil of the plaintiff is in the state of the forum." *Id.* § 142 cmt. g. However, the comments go on to say that, "[i]n such a situation, the forum should entertain the claim only in extreme and unusual circumstances." *Id.* This latter statement, made by the Restatement authors in the context of state conflicts jurisprudence, seems even more important in the context of ERISA, where uniformity of treatment among beneficiaries is a primary concern. *See generally Pilot Life Ins. Co. v. Dedaux*, 481 U.S. 41, 56 (1987) (discussing the legislative history of ERISA on the need for uniformity of treatment). Indeed, were we to follow the plaintiffs' theory to its logical end, this class action would be governed by a "crazy quilt" of limitations periods and the federal interest in uniformity would be rendered nugatory. *Doe v. Blue Cross & Blue Shield*, 112 F.3d 869, 874 (7th Cir. 1997). We conclude therefore that application of New York limitations law to the present

---

[15] (...continued)
them benefits under the plan. The plan's contractual choice-of-law provision cannot control a claim under § 510 that is by definition extra-contractual.

dispute better serves the federal policies at issue in this case and should displace the law of the forum.

## D.

Now that we have selected New York law as the source of the applicable limitations period, we must " 'characterize the essence of' the federal claim in question and find the most analogous cause of action." *Teumer*, 34 F.3d at 547 (citing *Wilson,* 471 U.S. at 267-70). In *Teumer*, we held that allegations similar to the ones set forth in this complaint most resembled the tort of retaliatory discharge under Illinois law, which, like § 510, encompasses "discharges that *either* retaliate against *or* interfere with the exercise of favored rights." *Teumer*, 34 F.3d at 549 (emphasis in original). Noting that § 510 protects workers against the "disruption of employment privileges to *prevent* (i.e. interfere with) the vesting or enjoyment of benefit rights," we concluded that the Illinois tort of retaliatory discharge captured " 'the essence of' the federal claim in question" and was therefore "the most analogous cause of action." *Teumer*, 34 F.3d at 546-47 (emphasis in original) (quoting *Wilson*, 471 U.S. at 267-70).

Like Illinois, New York has a retaliatory discharge cause of action, contained in New York Workers' Compensation Law § 120. Section 120 provides in pertinent part:

> It shall be unlawful for any employer or his or her duly authorized agent to discharge or in any other manner discriminate against an employee as to his or her employment because such employee has claimed or attempted to claim compensation from such employer, or because he or she has testified or is about to testify in a proceeding under this chapter and no other

valid reason is shown to exist for such action by the employer.

   Any complaint alleging such an unlawful discriminatory practice must be filed within two years of the commission of such practice. . . .

N.Y. Work. Comp. Law § 120. The Second Circuit, relying expressly on our analysis in *Teumer*, held that section 120 of the workers' compensation law provides the closest New York analog to a suit under § 510. *See Sandberg v. KPMG Peat Marwick, L.L.P.*, 111 F.3d 331, 335-36 (2d Cir. 1997). Noting that section 120 protects against the same employer actions as § 510, including employer interference with obtaining benefits, our colleagues on the Second Circuit believed the parallel between the New York statute and § 510 to be "obvious." *Id.* at 336. We agree; the plaintiffs' therefore had two years to institute this proceeding.

### E.

   Finally, we must determine what event started the clock running on the two-year limitations period. This question of "accrual" is decided by reference to federal common law. *See Tolle*, 977 F.2d at 1138 (citing *Delaware State Coll. v. Ricks*, 449 U.S. 250 (1980)). We begin our analysis by identifying the alleged unlawful conduct that forms the basis for the claim and then ascertaining when this act occurred. *See Tolle*, 977 F.2d at 1139. After fixing the date of the alleged unlawful act, we then determine when the plaintiffs discovered "an injury resulting from this unlawful act." *Id.* In this case, for the plaintiffs' claims to have been timely under the applicable two-year statute of limitations, those claims must have accrued some time after January 7, 2001.

In an action under § 510, the unlawful act is the deci-
sion to interfere purposefully with a plan "participant's
ability to collect benefits to which the participant would
otherwise be entitled or from taking actions to prevent
such a participant from collecting benefits to which he or
she may become entitled." *Id.* Because an employer
can violate this prohibition before a participant has applied
for or even becomes entitled to benefits, the accrual of a
§ 510 claim turns on the discovery of the decision to inter-
fere with benefits rather than on the eventual effect of that
decision. This was our reasoning in *Tolle*, in which
we rejected a plaintiff's claim that her § 510 claim accrued
on the date that her termination went into effect instead
of on the date of the defendant's earlier decision to termi-
nate her. We held that "it is the decision and the partici-
pant's discovery of this decision that dictates accrual." *Id.* at
1140-41; *see also Teumer*, 34 F.3d at 550.

As a result, we cannot accept the plaintiffs' contention that
"[i]t is the application of the policy to a particular plaintiff,
not the existence of the policy in the abstract, that violates
the law and causes injury to each employee." Appellants'
Br. at 23. Here, the plaintiffs' § 510 claim is directed at
AXA's 1998 change in its method for determining a sales-
man's full-time status. As in *Tolle*, the plaintiffs' discovery
of their employer's allegedly unlawful decision put them on
notice of a potential ERISA violation and provided the
factual basis for their claim. The clock started running at this
moment, not when the plaintiffs eventually failed to meet
their sales quotas and ultimately lost eligibility.[16]

---

[16] Finally, the plaintiffs argue that, even if they discovered the
factual basis for their claim as early as January 1999, they suffered

(continued...)

Because the plaintiffs brought this action more than two years after their claim accrued, the district court properly dismissed the action as time-barred.

## Conclusion

For the foregoing reasons, the judgment of the district court is affirmed.

                                                              AFFIRMED

---

[16] (...continued)
a continuing violation each time that AXA terminated their plan eligibility for failure to meet the new sales quotas. As authority for this proposition, the plaintiffs rely on *Bazemore v. Friday*, 478 U.S. 385 (1986), a case in which black agricultural workers were permitted to recover for a pattern of salary discrimination that began prior to the enactment of the civil rights laws; the Court allowed the claims because each week's discriminatory paycheck was considered to be a new and actionable wrong. The plaintiffs in this case have not alleged a continuing wrong. Although the plaintiffs may have felt the continuing effects of their ineligibility for ERISA benefits, their allegations make clear that AXA's wrongful conduct, if any, involved the *decision* to change the way it classified insurance salesmen. There are no allegations that, once AXA had changed its policy, it then applied the new policy in a discriminating manner among salesmen. The plaintiffs therefore have alleged one violation not several, and it must be from the date of this single violation that the plaintiffs' time for filing their claim began to run. *Cf. Delaware State Coll. v. Ricks*, 449 U.S. 250, 258 (1980) ("It is simply insufficient for [the plaintiff] to allege that his termination gives present effect to the past illegal act and therefore perpetuates the consequences of forbidden discrimination." (internal quotation marks omitted)).

A true Copy:

Teste:

_____

*Clerk of the United States Court of
Appeals for the Seventh Circuit*