**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 14-1011

WILLIAM L. PENDER; DAVID L. MCCORKLE,

        Plaintiffs – Appellants,

   and

ANITA POTHIER; KATHY L. JIMENEZ; MARIELA ARIAS; RONALD R.
WRIGHT; JAMES C. FABER, JR., On behalf of themselves and on
behalf of all others similarly situated,

        Plaintiffs,

   v.

BANK OF AMERICA CORPORATION; BANK OF AMERICA, NA; BANK OF
AMERICAN PENSION PLAN; BANK OF AMERICA 401(K) PLAN; BANK OF
AMERICA CORPORATION CORPORATE BENEFITS COMMITTEE; BANK OF
AMERICA TRANSFERRED SAVINGS ACCOUNT PLAN,

        Defendants – Appellees,

   and

UNKNOWN PARTY, John and Jane Does #1-50, Former Directors
of NationsBank Corporation and Current and Former Directors
of Bank of America Corporation & John & Jane Does #51-100,
Current/Former Members of the Bank of America Corporation
Corporate Benefit; CHARLES K. GIFFORD; JAMES H. HANCE, JR.;
KENNETH D. LEWIS; CHARLES W. COKER; PAUL FULTON; DONALD E.
GUINN; WILLIAM BARNETT, III; JOHN T. COLLINS; GARY L.
COUNTRYMAN; WALTER E. MASSEY; THOMAS J. MAY; C. STEVEN
MCMILLAN; EUGENE M. MCQUADE; PATRICIA E. MITCHELL; EDWARD
L. ROMERO; THOMAS M. RYAN; O. TEMPLE SLOAN, JR.; MEREDITH
R. SPANGLER; HUGH L. MCCOLL; ALAN T. DICKSON; FRANK DOWD,
IV; KATHLEEN F. FELDSTEIN; C. RAY HOLMAN; W. W. JOHNSON;
RONALD TOWNSEND; SOLOMON D. TRUJILLO; VIRGIL R. WILLIAMS;
CHARLES E. RICE; RAY C. ANDERSON; RITA BORNSTEIN; B. A.
BRIDGEWATER, JR.; THOMAS E. CAPPS; ALVIN R. CARPENTER;

DAVID COULTER; THOMAS G. COUSINS; ANDREW G. CRAIG; RUSSELL W. MEYER-, JR.; RICHARD B. PRIORY; JOHN C. SLANE; ALBERT E. SUTER; JOHN A. WILLIAMS; JOHN R. BELK; TIM F. CRULL; RICHARD M. ROSENBERG; PETER V. UEBERROTH; SHIRLEY YOUNG; J. STEELE ALPHIN; AMY WOODS BRINKLEY; EDWARD J. BROWN, III; CHARLES J. COOLEY; ALVARO G. DE MOLINA; RICHARD M. DEMARTINI; BARBARA J. DESOER; LIAM E. MCGEE; MICHAEL E. O'NEILL; OWEN G. SHELL, JR.; A. MICHAEL SPENCE; R. EUGENE TAYLOR; F. WILLIAM VANDIVER, JR.; JACKIE M. WARD; BRADFORD H. WARNER; PRICEWATERHOUSE COOPERS, LLP,

Defendants.

————————

Appeal from the United States District Court for the Western District of North Carolina, at Charlotte. Graham C. Mullen, Senior District Judge. (3:05-cv-00238-GCM)

————————

Argued: January 27, 2015        Decided: June 8, 2015

————————

Before KEENAN, WYNN, and FLOYD, Circuit Judges.

————————

Reversed in part, vacated in part, and remanded by published opinion. Judge Wynn wrote the opinion, in which Judge Keenan and Judge Floyd joined.

————————

**ARGUED**: Eli Gottesdiener, GOTTESDIENER LAW FIRM, PLLC, Brooklyn, New York, for Appellants. Carter Glasgow Phillips, SIDLEY AUSTIN, LLP, Washington, D.C., for Appellees. **ON BRIEF**: Thomas D. Garlitz, THOMAS D. GARLITZ, PLLC, Charlotte, North Carolina, for Appellants. Irving M. Brenner, MCGUIREWOODS LLP, Charlotte, North Carolina; Anne E. Rea, Christopher K. Meyer, Chicago, Illinois, Michelle B. Goodman, David R. Carpenter, SIDLEY AUSTIN LLP, Los Angeles, California, for Appellees.

————————

WYNN, Circuit Judge:

In this Employee Retirement Income Security Act of 1974 ("ERISA") case, an employer was deemed to have wrongly transferred assets from a pension plan that enjoyed a separate account feature to a pension plan that lacked one. Although the transfers were voluntary and the employer guaranteed that the value of the transferred assets would not fall below the pre-transfer amount, an Internal Revenue Service audit resulted in a determination that the transfers nonetheless violated the law.

Plaintiffs, who held such separate accounts and agreed to the transfers, brought suit under ERISA and sought disgorgement of, i.e., an accounting for profits as to, any gains the employer retained from the transaction. The district court dismissed their case, holding that they lacked statutory and Article III standing. For the reasons that follow, we disagree and hold that Plaintiffs have both statutory and Article III standing. Further, we hold that Plaintiffs' claim is not time-barred. Accordingly, we reverse and remand the matter for further proceedings.

I.

A.

In 1998, NationsBank[1] ("the Bank") amended its defined-contribution plan ("the 401(k) Plan") to give eligible participants a one-time opportunity to transfer their account balances to its defined-benefit plan ("the Pension Plan"). The Pension Plan provided that participants who transferred their account balances would have the same menu of investment options that they did in the 401(k) Plan. Further, the Bank amended the Pension Plan to provide the guarantee that participants who elected to make the transfer would receive, at a minimum, the value of the original balance of their 401(k) Plan accounts ("the Transfer Guarantee").

The 401(k) Plan participants' accounts reflected the <u>actual</u> gains and losses of their investment options. In other words, the money that 401(k) Plan participants directed to be invested in particular investment options was actually invested in those investment options, and 401(k) Plan participants' accounts reflected the investment options' net performance.

By contrast, Pension Plan participants' accounts reflected the <u>hypothetical</u> gains and losses of their investment options. Although Pension Plan participants selected investment options,

_____

[1] In September 1998, NationsBank merged with BankAmerica Corporation. The resulting entity was named Bank of America Corporation. Here, "the Bank" collectively refers to the defendants.

4

this investment was purely notional. By design, Pension Plan participants' selected investment options had no bearing on how Pension Plan assets were actually invested. Instead, the Bank invested Pension Plan assets in investments of its choosing,[2] periodically crediting each Pension Plan participant's account with the greater of (1) the hypothetical performance of the participant's selected investment option, or (2) the Transfer Guarantee.

Plaintiffs William Pender and David McCorkle (collectively with those similarly situated, "Plaintiffs") are among the eligible participants who elected to transfer their account balances. Participants who elected to transfer their 401(k) Plan balances to the Pension Plan may not have appreciated the difference between the plans, particularly if they maintained their original investment options. But for the Bank, each transfer represented an opportunity to make money.[3] As long as

---

[2] The record does not state precisely what the Bank invested in, but nothing in the Pension Plan documents required the Bank to invest in the menu of investment options available to the 401(k) and Pension Plan participants.

[3] In communications to 401(k) Plan participants leading up to the transfers, the Bank explained that "[e]xcess proceeds would decrease plan costs, saving money for the company." J.A. 364. See also J.A. 375 ("What's in it for the Company? . . . When associates take advantage of the one-time 401(k) Plan transfer option, there is a potential savings to the company—the more money transferred, the greater the savings potential."). Although the Bank characterized the primary effect of the (Continued)

the Bank's actual investments provided a higher rate of return than Pension Plan participants' hypothetical investments, the Bank would retain the spread. And although the spread generated by each account might have been relatively small, in the aggregate and over time, this strategy could yield substantial gains for the Bank.[4]

B.

To illustrate by way of example, consider 401(k) Plan participants Jack and Jill. They each have account balances of $100,000, and each has selected the same investment option, which generates a 60-percent return over a 10-year period. Jack decides to keep his 401(k) Plan account, and Jill decides to make the transfer to the Pension Plan.

When Jill transfers her assets to the Pension Plan, she selects the same 60-percent-return investment option she had in the 401(k) Plan. But instead of actually investing the $100,000 Jill transferred to the Pension Plan according to her selected investment option, the Bank periodically notes the value that

transfer option as generating "savings," the difference between savings and profit in this context is merely semantic. Regardless of which term is used, the Bank made money.

[4] The Bank expressly noted this in its communication to transfer-eligible plan participants. J.A. 375 ("[T]he more money transferred, the greater the savings potential.")

6

her assets would have gained on her selected investment options but actually invests it in an investment portfolio that generates a 70-percent return over 10 years.

Fast forward ten years: Jack's actual investment of the initial $100,000 generates $60,000 in actual returns. Jill's hypothetical investment of the $100,000 she transferred from the 401(k) Plan to the Pension Plan generates $60,000 in investment credits. The accounts are both valued at $160,000.

Jack's $160,000 401(k) Plan account balance represents the full value of the initial balance plus his actual investment performance. But the $160,000 balance of Jill's Pension Plan account does not represent the full value of the $100,000 that she transferred from the 401(k) Plan and the actual investment performance of that money. Because the Bank actually invested that money in investment options with a 70-percent return over the ten-year period, it generated $70,000. Due to the difference between the Bank's actual rate of return and the rate of return of Jill's selected investment option, the Bank retains $10,000 after it credits her Pension Plan account with $60,000. The spread between the actual investment returns ($70,000) and the hypothetical returns ($60,000) may be small on the individual account level ($10,000 for Jill's Pension Plan account). But it is greater than the amount of money the Bank stands to gain from Jack's account ($0). And with the thousands

7

of Jills working for a large employer like the Bank, it has the potential to add up.

C.

In the wake of a June 2000 <u>Wall Street Journal</u> article covering these types of retirement plan transfers,[5] the Internal Revenue Service opened an audit of the Bank's plans. In 2005, the IRS issued a technical advice memorandum, in which it concluded that the transfers of 401(k) Plan participants' assets to the Pension Plan between 1998 and 2001 violated Internal Revenue Code § 411(d)(6) and Treasury Regulation § 1-411(d)-4, Q&A-3(a)(2). According to the IRS, the transfers impermissibly eliminated the 401(k) Plan participants' "separate account feature," meaning that participants were no longer being credited with the actual gains and losses "generated by funds contributed on the participant[s'] behalf." J.A. 518.

In May 2008, the Bank and the IRS entered into a closing agreement. Under the terms of the agreement, the Bank (1) paid a $10 million fine to the U.S. Treasury, (2) set up a special-purpose 401(k) plan, (3) and transferred Pension Plan assets that were initially transferred from the 401(k) Plan to the special-purpose 401(k) plan. The Bank also agreed to make an

---

[5] Ellen E. Schultz, <u>Firms Expand Uses of Retirement Funds: Bank of America Offers Staff Rollovers Into Pension Plan</u>, Wall St. Journal, June 19, 2000, at A2.

8

additional payment to participants who had elected to transfer their assets from the 401(k) Plan to the Pension Plan if the cumulative total return of their hypothetical investments was less than a certain amount.[6]   All settlement-related transfers were finalized by 2009.

D.

Plaintiffs filed their original complaint against the Bank in the U.S. District Court for the Southern District of Illinois in 2004, alleging several ERISA violations stemming from plan amendments and transfers.   The Bank moved under 28 U.S.C. § 1404(a) to change venue, and the case was transferred to the Western District of North Carolina.   There, the district court dismissed three of the four counts contained in the complaint. See McCorkle v. Bank of America Corp., 688 F.3d 164, 169 n.4, 177 (4th Cir. 2012).

Plaintiffs' lone remaining claim alleges a violation of ERISA § 204(g)(1), 29 U.S.C. § 1054(g)(1),[7] which states that an ERISA-plan participant's "accrued benefit" "may not be decreased by an amendment of the plan" unless specifically provided for in

_____

[6] For a more detailed discussion of how the Bank determined whether participants qualified for this additional payment, see Pender, 2013 WL 4495153, at *4.

[7] This opinion uses a parallel citation to the United States Code and the ERISA code the first time a statute is cited and thereafter refers only to the ERISA code citation.

9

ERISA or regulations promulgated pursuant to ERISA. According to Plaintiffs, the Bank improperly decreased the accrued benefit of the separate account feature. Relying, at least in part, upon the IRS's declaration that the transfers from the 401(k) Plan to the Pension Plan violated both Treasury Regulation § 1.411(d)-4, Q&A-3(a)(2) and the statute it implements, I.R.C. § 411(d)(6)(A)[8], Plaintiffs sought to use ERISA's civil enforcement provision, ERISA § 502(a), 29 U.S.C. § 1132(a), to recover the profits the Bank retained after it transferred the effected Pension Plan accounts to the special-purpose 401(k) plan.

At the hearing on the parties' cross-motions for summary judgment, the Bank argued that (1) its closing agreement with the IRS stripped Plaintiffs of Article III standing because it restored the separate account feature, and (2) the statute of limitations barred Plaintiffs' claims. Plaintiffs countered with a request for declarations that (1) they are entitled to any spread between what they were paid and the actual investment gains of the assets that were originally in the 401(k) Plan, and (2) the agreement between the Bank and the IRS did not extinguish their ERISA claims. The district court granted the

---

[8] I.R.C. § 411(d)(6)(A) is the Internal Revenue Code analogue to ERISA § 204(g)(1).

10

Bank's motion, denied Plaintiffs' motion, and dismissed the case on the basis that Plaintiffs lacked standing. Pender v. Bank of Am. Corp., No. 3:05-CV-00238-GCM, 2013 WL 4495153, at *11 (W.D.N.C. Aug. 19, 2013). Plaintiffs appealed.

## II.

We review a district court's disposition of cross-motions for summary judgment de novo, examining each motion seriatim. Libertarian Party of Virginia v. Judd, 718 F.3d 308, 312 (4th Cir.), cert. denied, 134 S. Ct. 681 (2013). We view the facts and inferences arising therefrom in the light most favorable to the non-moving party to determine whether there exists any genuine dispute of material fact or whether the movant is entitled to judgment as a matter of law. Id. And we review legal questions regarding standing de novo. David v. Alphin, 704 F.3d 327, 333 (4th Cir. 2013).

## III.

On appeal, Plaintiffs contend that they are entitled to the full value of the investment gains the Bank realized using the assets transferred to the Pension Plan. To assert such a claim under ERISA, Plaintiffs must possess both statutory and Article III standing, David, 704 F.3d at 333, which we now respectively address.

11

A.

To show statutory standing, Plaintiffs must identify the portion of ERISA that entitles them to bring the claim for the relief they seek. Plaintiffs argue that ERISA § 502(a)(1)(B), which allows a beneficiary to recover benefits due under the terms of the plan, enables them to bring their claim. In the alternative, they argue that Sections 502(a)(2) and 502(a)(3) also entitle them to the relief they seek. We consider each.

1.

Under ERISA § 502(a)(1)(B), "[a] civil action may be brought by a participant or a beneficiary to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." (emphases added). Plaintiffs argue that ERISA § 502(a)(1)(B) is the proper section under which to bring a claim for benefits due based on a misapplied formula and that the Bank "'misapplied' [the] formula" when it failed to administer the plan in a manner "consistent with ERISA's minimum standards." Appellants' Br. at 45-46 (emphasis omitted). However, CIGNA Corp. v. Amara, 131 S. Ct. 1866 (2011), explicitly precludes them from using this provision to recover the relief they seek.

In Amara, as here, the plaintiffs sought to enforce the plan not as written, but as it should properly be enforced under

12

ERISA. The district court ordered the terms of the plan "reformed" and then enforced the changed plan. Id. at 1866. But as the Supreme Court underscored, "[t]he statutory language speaks of enforcing the terms of the plan, not of changing them." Id. at 1876-77 (internal quotation marks, citation, and emphasis omitted). Indeed, "nothing suggest[ed] that [Section 502(a)(1)(B)] authorizes a court to alter those terms . . . where that change, akin to the reform of a contract, seems less like the simple enforcement of a contract as written and more like an equitable remedy." Id. at 1877.

Here, as in Amara, Plaintiffs' requested remedy would require the court to do more than simply enforce a contract as written. Rather, as we will soon discuss, what they ask sounds in equity. Accordingly, Section 502(a)(1)(B) provides no avenue for bringing their claim.

2.

Under ERISA § 502(a)(2), a plan beneficiary may bring a civil action for "appropriate relief" when a plan fiduciary breaches its statutorily imposed "responsibilities, obligations, or duties," ERISA § 409, 29 U.S.C. § 1109. Plaintiffs argue that they may seek relief under Section 502(a)(2) because the Bank breached a fiduciary obligation by failing to "act with the best interest of participants in mind" and by "ignor[ing] the terms of the amendments to the extent the amendments were

13

inconsistent with ERISA." J.A. 236. However, again Plaintiffs' claim is precluded by Supreme Court precedent because Pegram v. Herdrich, 530 U.S. 211 (2000), bars recovery under this provision.

Unlike traditional trustees who are bound by the duty of loyalty to trust beneficiaries, ERISA fiduciaries may wear two hats. "Employers, for example, can be ERISA fiduciaries and still take actions to the disadvantage of employee beneficiaries, when they act as employers (e.g., firing a beneficiary for reasons unrelated to the ERISA plan), or even as plan sponsors (e.g., modifying the terms of a plan as allowed by ERISA to provide less generous benefits)." Pegram, 530 U.S. at 225. Thus, the "threshold question" we must ask here is whether the Bank acted as a fiduciary when "taking the action subject to complaint." Id. at 226.

Under ERISA, a person is a fiduciary vis-à-vis a plan "to the extent" that he (1) "exercises any discretionary authority or discretionary control respecting management of such plan or . . . its assets," (2) "renders investment advice for a fee or other compensation," or (3) "has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Accordingly, the Bank is a fiduciary only to the extent that it acts in one of these three capacities.

14

As we read Count IV of Plaintiffs' Fourth Amended Complaint, i.e., Plaintiffs' one remaining claim, they assert two fiduciary breaches: (1) the Bank breached a fiduciary duty when it amended the 401(k) Plan and Pension Plan to permit the transfers; and (2) the Bank breached a fiduciary duty when it permitted the voluntary transfers between the plans. Neither holds water.

The first claim fails because "[p]lan sponsors who alter the terms of a plan do not fall into the category of fiduciaries." Lockheed Corp. v. Spink, 517 U.S. 882, 890 (1996). Instead, these actions are analogous to those of trust settlors. Id.

The second claim fails for the simple reason that the Bank did not exercise discretion regarding the transfers. The transfers between the 401(k) Plan and the Pension Plan occurred only for those plan participants who affirmatively and voluntarily directed the Bank to take such action. Because following participants' directives did not involve discretionary plan administration so as to trigger fiduciary liability as required under ERISA § 3(21)(A), that action cannot support an ERISA § 502(a)(2) claim.

3.

Finally, under Section 502(a)(3), a plan beneficiary may obtain "appropriate equitable relief" to redress "any act or

15

practice which violates" ERISA provisions contained in a certain subchapter of the United States Code. To determine whether Section 502(a)(3) applies to these facts, we must answer two questions: (1) Did the transfers violate a covered ERISA provision? And if so, (2) does the relief Plaintiffs seek constitute "appropriate equitable relief" within the meaning of the statute? The answer to both questions is yes.

i.

ERISA § 204(g)(1), which is also known as the anti-cutback provision, is a covered provision under Section 502(a)(3). It provides that a plan amendment may not decrease a participant's "accrued benefit." ERISA § 3(23)(B), 29 U.S.C. § 1002(23)(B), defines the accrued benefit in a 401(k) plan as "the balance of the individual's account." In the technical advice memorandum, the IRS concluded that the transfers between the 401(k) Plan and the Pension Plan violated I.R.C. § 411(d)(6) and Treasury Regulation § 1.411(d)-4, Q&A-3. See J.A. 519. I.R.C. § 411(d)(6) provides—in language nearly identical to ERISA § 204(g)(1)—that a plan amendment may not decrease a participant's "accrued benefit." Treasury Regulation § 1.411(d)-4, Q&A-3(a)(2), which implements I.R.C. § 411(d)(6), further provides that the "separate account feature of an employee's benefit under a defined contribution plan" is a protected benefit within the meaning of I.R.C. § 411(d)(6).

16

According to the IRS's interpretation of the relevant statutes and regulations, "'separate account feature' describes the mechanism by which a [defined contribution plan] accounts for contributions and actual earnings/losses thereon allocated to a specific defined contribution plan participant with the risk of investment experience being borne by the participant." J.A. 517. In a defined contribution plan like the 401(k) Plan, assets are actually invested in participants' chosen investment. 401(k) Plan participants bear the investment risk, but this is unproblematic because their account balances are identical to the actual performance of their actual investments.

By contrast, because Pension Plan participants' "investments" are hypothetical, there is no guaranteed correlation between their account balances and the assets available to cover Pension Plan liabilities. Depending on the success of the Bank's actual investments, the Pension Plan's assets may lack sufficient funds to satisfy all of its liabilities (or may run a surplus).

Turning to a textual analysis, we insert the relevant language from Section 3(23)(B) into Section 204(g)(1): "The [balance of the individual's account] may not be decreased by an amendment of the plan . . . ." The Transfer Guarantee provides assurances that individuals will receive no less than the monetary value of their 401(k) Plan accounts at the time of

17

transfer. But the Bank's promise that the value of the transferred funds will not decrease below a certain threshold—even if, for example, it invests Pension Plan assets poorly and loses the money—is not the same as actually not decreasing the account balance. It brings to mind the (instructive, even if distinguishable) difference between making a loan that the borrower promises to repay and leaving your money in your bank account. Assuming all goes well, the end result may well be the same; but they plainly are not the same thing.

In essence, Section 204(g)(1)'s prohibition against amendments that decrease defined contribution plan participants' account balances is a variation on a trustee's duty to preserve trust property. See Restatement (Second) of Trusts § 176. An ERISA plan sponsor is under no duty to ensure that defined contribution plan participants do not decrease their account balances through their own actions. But the plan sponsor cannot take actions that decrease participant account balances.

For these reasons, and in light of the similarities between I.R.C. § 411(d)(6) and ERISA § 204(g)(1), and the IRS's persuasive analysis, we hold that a defined contribution plan's separate account feature constitutes an "accrued benefit" that "may not be decreased by amendment of the plan" under Section 204(g)(1). The transfers at issue here resulted in a loss of

18

the separate account feature and thus violated Section 204(g)(1).

ii.

Although the Bank's violation of Section 204(g)(1) is a necessary component of Plaintiff's claim for relief under Section 502(a)(3), that violation alone is insufficient to confer statutory standing. Plaintiffs must also seek "appropriate equitable relief." This, they do.

The Supreme Court has interpreted the term "appropriate equitable relief," as used in Section 502(a)(3), to refer to "those categories of relief that, traditionally speaking (i.e., prior to the merger of law and equity) were typically available in equity." Amara, 131 S. Ct. at 1878 (quoting Sereboff v. Mid Atl. Med. Servs., Inc., 547 U.S. 356, 361 (2006)) (internal quotation marks omitted). Further, because Section 502(a)(3) functions as a "safety net, offering appropriate equitable relief for injuries caused by violations that § 502 does not elsewhere adequately remedy," Varity Corp. v. Howe, 516 U.S. 489, 512 (1996), equitable relief will not normally be "appropriate" if relief is available under another subsection of Section 502(a). Id. at 515.

Here, Plaintiffs seek the difference between (1) the actual investment gains the Bank realized using the assets transferred to the Pension Plan, and (2) the transferred assets'

19

hypothetical investment performance, which the Bank has already paid Pension Plan participants. In other words, Plaintiffs seek the profit the Bank made using their assets. This is the hornbook definition of an accounting for profits.

An accounting for profits "is a restitutionary remedy based upon avoiding unjust enrichment." 1 D. Dobbs, Law of Remedies § 4.3(5), p. 608 (2d ed. 1993) (hereinafter Dobbs). It requires the disgorgement of "profits produced by property which in equity and good conscience belonged to the plaintiff." Id. It is akin to a constructive trust, but lacks the requirement that plaintiffs "identify a particular res containing the profits sought to be recovered." Great-W. Life & Annuity Ins. Co. v. Knudson, 534 U.S. 204, 214 n.2 (2002) (citing 1 Dobbs § 4.3(1), at 588; id., § 4.3(5), at 608).

In Knudson, the Supreme Court expressly noted that, unlike other restitutionary remedies, an accounting for profits is an equitable remedy. 534 U.S. at 214 n.2. The Court also suggested that an accounting for profits would support a claim under Section 502(a)(3) in the appropriate circumstances. See id. (noting that the petitioners did not claim profits produced by certain proceeds and were not entitled to those proceeds). This case presents those appropriate circumstances.

Unlike the petitioners in Knudson, Plaintiffs seek profits generated using assets that belonged to them. And, as explained

20

above, Section 502(a)'s other subsections do not afford Plaintiffs any relief. If Section 204(g)(1)'s proscription against decreasing accrued benefits is to have any teeth, the available remedies must be able to reach situations like the one this case presents, i.e., where a plan sponsor benefits from an ERISA violation, but plan participants—perhaps through luck or agency intervention—suffer no monetary loss. See McCravy v. Met. Life Ins. Co., 690 F.3d 176, 182–83 (4th Cir. 2012) ("[W]ith Amara, the Supreme Court clarified that [various equitable] remedies . . . are indeed available to ERISA plaintiffs . . . . [O]therwise, the stifled state of the law interpreting [Section 502(a)(3)] would encourage abuse."). Because it "holds the defendant liable for his profits, not for damages," 1 Dobbs § 4.3(5), at 611, the equitable remedy of accounting for profits adequately addresses this concern. Cf. Amalgamated Clothing & Textile Workers Union, AFL-CIO v. Murdock, 861 F.2d 1406, 1413–14 (9th Cir. 1988) (holding that a constructive trust was an "important, appropriate, and available" remedy under Section 502(a)(3) for breach of trust, even when plaintiffs had "received their actuarially vested plan benefits").

In sum, Plaintiffs have statutory standing under Section 502(a)(3) to bring their claim.

B.

21

The Bank argues that even if it violated certain provisions of ERISA, the district court properly granted summary judgment because Plaintiffs lack Article III standing. The Bank argues that the transfers from the Pension Plan to the special-purpose 401(k) plan mooted any injury.

For the federal courts to have jurisdiction, plaintiffs must possess standing under Article III, § 2 of the Constitution. See David, 704 F.3d at 333. There exist three "irreducible minimum requirements" for Article III:

> (1) an injury in fact (i.e., a 'concrete and particularized' invasion of a 'legally protected interest');
>
> (2) causation (i.e., a 'fairly . . . trace[able]' connection between the alleged injury in fact and the alleged conduct of the defendant); and
>
> (3) redressability (i.e., it is 'likely' and not merely 'speculative' that the plaintiff's injury will be remedied by the relief plaintiff seeks in bringing suit).

Sprint Commc'ns Co., L.P. v. APCC Serv., Inc., 554 U.S. 269, 273-74 (2008) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)).

1.

Our analysis first focuses on whether Plaintiffs have demonstrated an injury in fact. The crux of the Bank's standing argument is that Plaintiffs have not suffered a financial loss. We, however, agree with the Third Circuit that "a financial loss

22

is not a prerequisite for [Article III] standing to bring a disgorgement claim under ERISA." Edmonson v. Lincoln Nat. Life Ins. Co., 725 F.3d 406, 417 (3d Cir. 2013), cert. denied, 134 S. Ct. 2291 (2014); see also Vander Luitgaren v. Sun Life Ins. Co. of Canada, No. 09-CV-11410, 2010 WL 4722269, at *1 (D.Mass. Nov. 18, 2010) (rejecting argument that plaintiff lacked standing to sue for disgorgement of profit earned via a retained asset account).[9]

As an initial matter, it goes without saying that the Supreme Court has never limited the injury-in-fact requirement to financial losses (otherwise even grievous constitutional rights violations may well not qualify as an injury). Instead, an injury refers to the invasion of some "legally protected interest" arising from constitutional, statutory, or common law. Lujan v. Defenders of Wildlife, 504 U.S. 555, 578 (1992). Indeed, the interest may exist "solely by virtue of statutes creating legal rights, the invasion of which creates standing."

---

[9] But see Kendall v. Employees Ret. Plan of Avon. Prods., 561 F.3d 112, 119 (2d Cir. 2009). In Kendall, the Second Circuit articulated the requirement that ERISA plaintiffs seeking disgorgement must show individual loss. 561 F.3d 112. But such a limitation would foreclose an action for breach of fiduciary duty in cases where the fiduciary profits from the breach but the plan or plan beneficiaries incur no financial loss. ERISA, however, provides for a recovery in such cases, and we reject such "perverse incentives." McCravy, 690 F.3d at 183. We thus similarly reject the Second Circuit's view.

23

<u>Id.</u> (internal quotation marks and citation omitted). Thus, "standing is gauged by the specific common-law, statutory or constitutional claims that a party presents." <u>Int'l Primate Prot. League v. Adm'rs of Tulane Educ. Fund</u>, 500 U.S. 72, 77 (1991). We therefore examine the principles that underlie Plaintiffs' claim for an accounting for profits under ERISA § 502(a)(3) to discern whether there exists a legally protected interest.

It is blackletter law that a plaintiff seeking an accounting for profits need not suffer a financial loss. <u>See</u> 1 Dobbs § 4.3(5), at 611 ("Accounting holds the defendant liable for his profits, not damages."); <u>see also</u> Restatement (Third) on Restitution and Unjust Enrichment § 51 cmt. a (2011) (noting that the object of an accounting "is to strip the defendant of a wrongful gain"). Requiring a financial loss for disgorgement claims would effectively ensure that wrongdoers could profit from their unlawful acts as long as the wronged party suffers no financial loss. We reject that notion. <u>Edmonson</u>, 725 F.3d at 415.[10]

---

[10] The district court supported its ruling that Plaintiffs failed to satisfy Article III's injury-in-fact requirement with a citation to <u>Horvath v. Keystone Health Plan East, Inc.</u>, 333 F.3d 450, 456 (2003), which it said stood for the proposition that an ERISA plaintiff seeking disgorgement must show individual loss. <u>Pender</u>, 2013 WL 4495153, at *9. Yet the Third Circuit itself has made plain that "[n]othing in <u>Horvath</u> . . . (Continued)

24

As the Third Circuit recently underscored—in a fiduciary breach case that, while distinguishable, we nevertheless find instructive—requiring a plaintiff seeking an accounting for profits to demonstrate a financial loss would allow those with obligations under ERISA to profit from their ERISA violations, so long as the plan and plan beneficiaries suffer no financial loss. Edmonson, 725 F.3d at 415. Such a result would be hard to square with the overall tenor of ERISA, "a comprehensive statute designed to promote the interests of employees and their beneficiaries in employee benefit plans." Ingersoll–Rand Co. v. McClendon, 498 U.S. 133, 137 (1990) (internal quotation marks omitted). In addition, it would directly contradict ERISA's provision covering liability for breach of fiduciary duty, which requires a fiduciary who breaches "any of [his or her statutory] responsibilities, obligations, or duties" to restore "any profits" to the plan. ERISA § 409(a).

Finally, we note that ERISA borrows heavily from the language and the law of trusts. See Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 110 (1989) ("ERISA abounds with the

states or implies that a net financial loss is required for standing to bring a disgorgement claim." Edmonson, 725 F.3d at 417.

25

language and terminology of trust law.").[11] Under traditional trust law principles, when a trustee commits a breach of trust, he is accountable for the profit regardless of the harm to the beneficiary. See Restatement (Second) of Trusts § 205, cmt. h; see also 4 Scott & Ascher on Trusts § 24.7, at 1682(5th ed. 2006) ("It is certainly true that a trustee who makes a profit through a breach of trust is accountable for the profit. But it is also true that a trustee is accountable for all profits arising out of the administration of the trust, regardless of whether there has been a breach of trust.").

By proscribing plan amendments that decrease plan participants' accrued benefits—i.e., harm beneficiaries' existing rights—ERISA functionally imports traditional trust principles. Here, these principles dictate that plan beneficiaries have an equitable interest in profits arrived at by way of a decrease in their benefits.[12]

---

[11] Courts have also looked to trust principles to answer questions regarding Article III standing in appropriate cases. E.g., Scanlan, 669 F.3d at 845 ("[W]e see no reason why canonical principles of trust law should not be employed when determining the nature and extent of a discretionary beneficiary's interest for purposes of an Article III standing analysis.").

[12] Accord United States v. $4,224,958.57, 392 F.3d 1002, 1005 (9th Cir. 2004) (holding that if claimants proved their constructive trust claim they would have an equitable interest in the defendant property, which would provide them with Article III standing).

In sum, for standing purposes, Plaintiffs incurred an injury in fact, i.e., an invasion of a legally protected interest, because they "suffered an individual loss, measured as the 'spread' or difference between the profit the [Bank] earned by investing the retained assets and the [amount] it paid to [them]." Edmonson, 725 F.3d at 417.

2.

Continuing the Article III standing analysis, Plaintiffs satisfy the causation and redressability requirements. But for the Bank's improper retention of profits, Plaintiffs would not have suffered an injury in fact. And the relief Plaintiffs seek is not speculative in nature; the Bank invested those assets, and the profits made by those investments should be readily ascertainable.

3.

The Bank argues that even if Plaintiffs had Article III standing at the time they filed the suit, its closing agreement with the IRS restored any loss of the separate account feature and mooted Plaintiffs' claims. Here, too, we disagree.

The Supreme Court has repeatedly referred to mootness as "the doctrine of standing set in a time frame." Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 170 (2000) (quoting Arizonans for Official English v. Arizona, 520 U.S. 43, 68 (1997)). If a live case or controversy ceases

27

to exist after a suit has been filed, the case will be deemed moot and dismissed for lack of standing.  Lewis v. Cont'l Bank Corp., 494 U.S. 472, 477 (1990).  But "[a] case becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party."  Knox v. Serv. Employees Int'l Union, Local 1000, 132 S. Ct. 2277, 2287 (2012) (quoting Erie v. Pap's A.M., 529 U.S. 277, 287 (2000) (internal quotation marks omitted)) (emphasis added).

The Bank rightly notes that its closing agreement with the IRS restored Plaintiffs' separate account feature.  That restoration, however, did not moot the case.  Plaintiffs contend that the Bank retained a profit, even after it restored the separate account feature to Plaintiffs and paid a $10 million fine to the IRS.  Defendants do not rebut this argument, noting only that there has been no discovery to this effect.  If an accounting ultimately shows that the Bank retained no profit, the case may well then become moot.  "But as long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot."  Ellis v. Bhd. of Ry., Airline & S.S. Clerks, Freight Handlers, Exp. & Station Employees, 466 U.S. 435, 442 (1984) (citing Powell v. McCormack, 395 U.S. 486, 496–98 (1969)).

In sum, we hold that Plaintiffs have Article III standing to bring their claims.

28

IV.

The Bank argues that even if Plaintiffs have standing, their claims are time-barred by the applicable statute of limitations. To determine what the applicable statute of limitations is, we engage in a three-part analysis. First, we identify the statute of limitations for the state claim most analogous to the ERISA claim at issue here. Second, because of the 28 U.S.C. § 1404(a) transfer, we must determine whether the Fourth Circuit's or the Seventh Circuit's choice-of-law rules apply. And third, we apply the relevant choice-of-law rules to determine which state's statute of limitations applies.

A.

"Statutes of limitations establish the period of time within which a claimant must bring an action." Heimeshoff v. Hartford Life & Acc. Ins. Co., 134 S. Ct. 604, 610 (2013). When ERISA does not prescribe a statute of limitations, courts apply the most analogous state-law statute of limitations. White v. Sun Life Assur. Co., 488 F.3d 240, 244 (4th Cir. 2007), abrogated on other grounds by Heimeshoff, 134 S. Ct. 604.

Although the parties have suggested that the statute of limitations for contract claims is most analogous, we disagree. It would be incongruous to hold that Plaintiffs are unable to pursue relief under Section 502(a)(1)(B) because their claim

29

sounds in equity instead of contract, and then apply the statute of limitations for a breach of contract claim.

In our view, the most analogous statute of limitations is that for imposing a constructive trust. As noted above, the equitable remedy of an accounting for profits is akin to a constructive trust. Knudson, 534 U.S. at 214 n.2.

Both North Carolina and Illinois recognize such remedies. In North Carolina, a constructive trust may be "imposed by courts of equity to prevent the unjust enrichment of the holder of title to, or of an interest in, property which such holder acquired through . . . circumstance[s] making it inequitable for him to retain it against the claim of the beneficiary of the constructive trust." Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC, 723 S.E.2d 744, 751 (N.C. 2012) (quoting Wilson v. Crab Orchard Dev. Co., 171 S.E.2d 873, 882 (N.C. 1970)). Likewise, Illinois's highest court has stated that "[w]hen a person has obtained money to which he is not entitled, under such circumstances that in equity and good conscience he ought not retain it, a constructive trust can be imposed to avoid unjust enrichment." Smithberg v. Illinois Mun. Ret. Fund, 735 N.E.2d 560, 565 (Ill. 2000). Furthermore, neither state requires wrongdoing to impose a constructive trust. See id. (citing several cases); Houston v. Tillman, 760

S.E.2d 18, 21–22 (N.C. Ct. App. 2014) (citing Variety Wholesalers, Inc., 723 S.E.2d at 751–52).

In Illinois, the applicable statute of limitations is five years. Frederickson v. Blumenthal, 648 N.E.2d 1060, 1063 (Ill. App. Ct. 1995) (citing 735 Ill. Comp. Stat. 5/13-205; Chicago Park District v. Kenroy, Inc., 374 N.E.2d 670 (Ill. App. Ct. 1978), aff'd in part, rev'd in part by 402 N.E.2d 181 (Ill. 1980)). In North Carolina, a ten-year statute of limitations applies to "[a]ctions seeking to impose a constructive trust or to obtain an accounting." Tyson v. N. Carolina Nat. Bank, 286 S.E.2d 561, 564 (N.C. 1982).

B.

We next turn to the question of which circuit's choice-of-law rules apply. Plaintiffs initially filed this case in the District Court for the Southern District of Illinois. The Bank moved, pursuant to 28 U.S.C. § 1404(a), to change the venue of the case by having it transferred to the District Court for the Western District of North Carolina. We must therefore determine whether the choice-of-law rules of the transferor court or those of the transferee court apply.

The majority of circuits to consider the issue apply the transferor court's choice-of-law rules. See, e.g., Hooper v. Lockheed Martin Corp., 688 F.3d 1037, 1046 (9th Cir. 2001); In re Ford Motor Co., 591 F.3d 406, 413 n.15 (5th Cir. 2009);

31

_Olcott v. Delaware Flood Co._, 76 F.3d 1538, 1546-47 (10th Cir. 1996; _Eckstein v. Balcor Film Investors_, 8 F.3d 1121, 1127 (7th Cir. 1993).[13]  This conclusion makes sense:  "The legislative history of [Section] 1404(a) certainly does not justify the rather startling conclusion that one might get a change of law as a bonus for a change of venue."  _Van Dusen v. Barrack_, 376 U.S. 612, 635-36 (1964) (internal quotation marks omitted).  We join the majority of our sister circuits and hold that the transferor court's choice-of-law rules apply when a case has been transferred pursuant to 28 U.S.C. § 1404(a).  Accordingly, the Seventh Circuit's choice-of-law rules apply here.

C.

Under the Seventh Circuit's choice-of-law rules, we look to the forum state "as the starting point."  _Berger v. AXA Network LLC_, 459 F.3d 804, 813 (7th Cir. 2006).  But "[i]f another state with a significant connection to the parties and to the transaction has a limitations period that is more compatible with the federal policies underlying the federal cause of action, that state's limitations law ought to be employed

---

[13] _But see_ _Lanfear v. Home Depot, Inc._, 536 F.3d 1217, 1223 (11th Cir. 2008) (holding that the transferee court may apply its own choice-of-law rules when the case involves interpreting federal law); _Menowitz v. Brown_, 991 F.2d 36, 41 (2d Cir. 1993) (same).

32

because it furthers, more than any other option, the intent of Congress when it created the underlying right." Id.

Here, although Illinois may be the forum state, see Atl. Marine Const. Co. v. U.S. Dist. Court for W. Dist. of Texas, 134 S. Ct. 568, 582-83 (2013) (noting that the "state law applicable in the original court also appl[ies] in the transferee court" unless a Section 1404(a) motion is "premised on the enforcement of a valid forum-selection clause"); J.A. 462-64 (memorandum and order discussing reasons for granting the Bank's motion to change venue), it is clear to us that North Carolina has a "significant connection" to the dispute for the same reasons for which the district court granted the Bank's Section 1404(a) motion: "the decision to 'permit' the 'voluntary' transfer of 401(k) Plan assets to the converted cash balance plan took place in the Western District of North Carolina" and "virtually all the relevant witnesses reside in the Western District of North Carolina." J.A. 462-64.

Further, the Pension Plan contains a choice-of-law provision applying North Carolina law when federal law does not apply. See Berger, 459 F.3d at 813-14 (considering a choice-of-law clause as a non-controlling but relevant factor in selecting a limitations period). Finally, North Carolina's ten-year limitations period is "more compatible with the federal policies" underlying ERISA than Illinois's five-year limitations

period; the longer period provides aggrieved plaintiffs with more opportunities to advance one of ERISA's core policies: "to protect . . . the interests of participants in employee benefit plans and their beneficiaries . . . by providing for appropriate remedies, sanctions, and ready access to the Federal courts." 29 U.S.C. § 1001(b).

The first of the transfers in question took place in 1998. Plaintiffs filed suit in 2004, a full four years before the ten-year statute of limitations would have run. Accordingly, Plaintiffs' claims are not time-barred by the applicable ten-year limitations period. The statute of limitations therefore cannot serve as a basis for affirming the district court's grant of summary judgment to the Bank.

V.

For the foregoing reasons, we reverse the district court's grant of summary judgment in favor of the Bank, vacate that portion of the district court's order denying Plaintiffs' motion for summary judgment based on its erroneous standing determination, and remand for further proceedings.

REVERSED IN PART,
VACATED IN PART,
AND REMANDED

34