**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 17-1485**

WILLIAM L. PENDER; DAVID L. MCCORKLE,

        Plaintiffs - Appellants,

and

ANITA POTHIER; KATHY L. JIMENEZ; MARIELA ARIAS; RONALD R. WRIGHT; JAMES C. FABER, JR., On behalf of themselves and on behalf of all others similarly situated,

        Plaintiffs,

v.

BANK OF AMERICA CORPORATION; BANK OF AMERICA, NA; BANK OF AMERICAN PENSION PLAN; BANK OF AMERICA 401(K) PLAN; BANK OF AMERICA CORPORATION CORPORATE BENEFITS COMMITTEE; BANK OF AMERICA TRANSFERRED SAVINGS ACCOUNT PLAN,

        Defendants - Appellees,

and

UNKNOWN PARTY, John and Jane Does #1-50, Former Directors of NationsBank Corporation and Current and Former Directors of Bank of America Corporation & John & Jane Does #51-100, Current/Former Members of the Bank of America Corporation Corporate Benefit; PRICEWATERHOUSE COOPERS, LLP; CHARLES K. GIFFORD; JAMES H. HANCE, JR.; KENNETH D. LEWIS; CHARLES W. COKER; PAUL FULTON; DONALD E. GUINN; WILLIAM BARNETT, III; JOHN T. COLLINS; GARY L. COUNTRYMAN; WALTER E. MASSEY; THOMAS J. MAY; C. STEVEN MCMILLAN; EUGENE M. MCQUADE; PATRICIA E. MITCHELL; EDWARD L. ROMERO; THOMAS M. RYAN; O. TEMPLE SLOAN, JR.; MEREDITH R. SPANGLER; HUGH L. MCCOLL; ALAN T. DICKSON; FRANK DOWD, IV; KATHLEEN F.

FELDSTEIN; C. RAY HOLMAN; W. W. JOHNSON; RONALD TOWNSEND; SOLOMON D. TRUJILLO; VIRGIL R. WILLIAMS; CHARLES E. RICE; RAY C. ANDERSON; RITA BORNSTEIN; B. A. BRIDGEWATER, JR.; THOMAS E. CAPPS; ALVIN R. CARPENTER; DAVID COULTER; THOMAS G. COUSINS; ANDREW G. CRAIG; RUSSELL W. MEYER-, JR.; RICHARD B. PRIORY; JOHN C. SLANE; ALBERT E. SUTER; JOHN A. WILLIAMS; JOHN R. BELK; TIM F. CRULL; RICHARD M. ROSENBERG; PETER V. UEBERROTH; SHIRLEY YOUNG; J. STEELE ALPHIN; AMY WOODS BRINKLEY; EDWARD J. BROWN, III; CHARLES J. COOLEY; ALVARO G. DE MOLINA; RICHARD M. DEMARTINI; BARBARA J. DESOER; LIAM E. MCGEE; MICHAEL E. O'NEILL; OWEN G. SHELL, JR.; A. MICHAEL SPENCE; R. EUGENE TAYLOR; F. WILLIAM VANDIVER, JR.; JACKIE M. WARD; BRADFORD H. WARNER,

Defendants.

_____

Appeal from the United States District Court for the Western District of North Carolina, at Charlotte. Graham C. Mullen, Senior District Judge. (3:05-cv-00238-GCM)

_____

Argued: March 21, 2018                    Decided: June 5, 2018

_____

Before KEENAN, WYNN, and FLOYD, Circuit Judges.

_____

Affirmed by unpublished opinion. Judge Wynn wrote the majority opinion, in which Judge Floyd joined. Judge Keenan wrote a dissenting opinion.

_____

**ARGUED:** Julia Penny Clark, BREDHOFF & KAISER, PLLC, Washington, D.C., for Appellants. Carter Glasgow Phillips, SIDLEY AUSTIN LLP, Washington, D.C., for Appellees. **ON BRIEF:** Eli Gottesdiener, GOTTESDIENER LAW FIRM, PLLC, Brooklyn, New York; Thomas D. Garlitz, THOMAS D. GARLITZ, PLLC, Charlotte, North Carolina, for Appellants. Irving M. Brenner, MCGUIREWOODS LLP, Charlotte, North Carolina; Anne E. Rea, David F. Graham, Tacy F. Flint, Steven J. Horowitz, SIDLEY AUSTIN LLP, Chicago, Illinois, for Appellees.

_____

Unpublished opinions are not binding precedent in this circuit.

WYNN, Circuit Judge:

This Employment Retirement Income Security Act of 1974 ("ERISA") case returns to the Court for a third time. *See Pender v. Bank of Am. Corp.*, 788 F.3d 354 (4th Cir. 2015); *McCorkle v. Bank of Am. Corp.*, 688 F.3d 164 (4th Cir. 2012). Plaintiffs, a class of current and former employees of Bank of America and certain of its predecessors (collectively, with the Bank's Pension Plan, the "Bank"), seek an equitable accounting for any profits accruing to the Bank resulting from its unlawful transfer of the balances of Plaintiffs' 401(k) Plan accounts into the general account of the Bank's Pension Plan. *Pender*, 788 F.3d at 358. In 2015, this Court ruled that the district court erred in dismissing Plaintiffs' accounting action, and remanded the case to the district court to determine whether the Bank retained any profit as a result of the unlawful transfers and its use of the transferred funds. *Id.* at 368, 370.

On appeal, as it did before the district court, the Bank advances a simple, if somewhat surprising, argument—that the Pension Plan's investment strategy for the unlawfully transferred funds, which was developed and implemented by the Bank's trained asset managers, *performed far worse* than Plaintiffs' investment strategies, as reflected in their 401(k) account investment allocations. Because Plaintiffs' investment allocations outperformed the Bank's investment strategy—and the Pension Plan was responsible for making up any shortfall between the performances of the Bank's investment strategy and Plaintiffs' allocations—the Bank maintains that it did not profit from the transfers. After conducting a four-day bench trial, during which the parties presented fact and expert testimony and evidence, the district court agreed with the Bank and, therefore, dismissed

3

Plaintiffs' action as moot. *Pender v. Bank of Am. Corp.*, No. 3:05-CV-00238, 2017 WL 1536234, at *23 (W.D.N.C. Apr. 27, 2017). For the reasons that follow, we affirm.

I.

In 1998, the Bank amended its 401(k) Plan to provide eligible participants with the opportunity to transfer their account balances to the Bank's defined-benefit Pension Plan. *Pender*, 788 F.3d at 358. Once transferred to the Pension Plan, beneficiaries could continue to allocate their account balances among various investment options. *Id.* at 358. However, unlike with balances held in the 401(k) Plan, which were actually invested in the selected investment options, beneficiaries who elected to transfer their accounts to the Pension Plan would have only notional (or hypothetical) accounts—the Bank could invest the beneficiaries' account balances however it saw fit. *Id.* In return for beneficiaries' agreement to transfer their balances to the Pension Plan and the use of the beneficiaries' funds, the Bank guaranteed that such beneficiaries' account balances would not fall below the amount in their account at the time of the transfer. *Id.* The Bank offered the transfer option because it believed it could obtain a higher return with the beneficiaries' money than the beneficiaries were obtaining. Many beneficiaries elected to transfer their 401(k) Plan account balances to the Pension Plan, with beneficiaries in aggregate transferring nearly $2 billion in their 401(k) Plan balances to the Pension Plan for the Bank's use.

In 2005, the Internal Revenue Service (the "IRS") concluded that the transfers violated ERISA's "anti-cutback provision," 29 U.S.C. § 1054(g)(1), which bars plan amendments from decreasing a participant's "accrued benefit." *Id.* at 363. The IRS found,

4

and this Court later agreed, that stripping beneficiaries of the 401(k) Plan's "separate account feature" deprived beneficiaries of a meaningful benefit because it subjected plan participants to the risk that the Bank would invest the transferred assets poorly, and therefore lack sufficient funds to satisfy all of the returns a beneficiary obtained in his notional investment account. *Id.* at 363–64 ("[T]he Bank's promise that the value of the transferred funds will not decrease below a certain threshold—even if, for example, it invests Pension Plan assets poorly and loses money—is not the same as actually not decreasing the account balance.").

In 2008, the IRS reached a closing agreement[1] with the Bank, pursuant to which the Bank "(1) paid a $10 million fine to the U.S. Treasury, (2) set up a special purpose 401(k) plan, (3) . . . transferred Pension Plan assets that were initially transferred from the 401(k) Plan to the special-purpose 401(k) plan," and (4) made additional payments to certain plan participants whose hypothetical return in their notional account was less than a defined amount. *Id.* at 360. The Bank completed those transfers in 2009. *Id.* Importantly, as a result of the transfers to the special-purpose 401(k) plan and the additional payments to certain plan participants, all Plaintiffs' current account balances are at least as large as they would have been had the funds in Plaintiffs' accounts actually been invested in accordance with their notional allocations. *Pender v. Bank of Am. Corp.*, No. 3:05-CV-238, 2013 WL 4495153, at *10 (W.D.N.C. Aug. 19, 2013), *rev'd on other grounds*, 788 F.3d 354.

---

[1] A closing agreement is a binding agreement finally and conclusively settling—*i.e.*, closing the file as to—a tax issue between the IRS and a taxpayer.

5

Around the same time that the IRS began to take action, Plaintiffs filed a variety of equitable and statutory claims related to the transfers. *Pender*, 788 F.3d at 360. All but one of those claims were dismissed and are not at issue in this appeal. *McCorkle*, 688 F.3d at 169 n.4, 177. Plaintiffs' lone remaining claim is premised on the Bank's violation of the anti-cutback provision. In 2013, the district court dismissed that claim on grounds that the remedial provisions in the IRS closing agreement rendered such claims moot because it restored the 401(k) Plan's separate account feature. *Pender*, 2013 WL 4495153, at *5–9.

This Court reversed, explaining that Plaintiffs suffered a legally cognizable ongoing injury if the Bank retained a profit as a result of its unlawful transfer of the 401(k) Plan balances to the Pension Plan, and its investment of those balances. *Pender*, 788 F.3d at 364–65. In reaching that conclusion, this Court held that Plaintiffs could pursue relief under ERISA Section 502(a)(3), which authorizes a plan beneficiary to obtain any "appropriate equitable relief" to redress "any act or practice which violates" certain ERISA provisions, including the anti-cutback provision. *Id.* at 363. This Court further concluded that the "accounting for profits" sought by Plaintiffs is one form of "equitable relief" available under Section 502(a)(3). *Id.* at 364–65.

On remand, the district court conducted a four-day bench trial to determine "whether, after it restored the separate account feature and paid a $10 million fine to the IRS, the Bank nevertheless profited from its transfer strategy." *Pender*, 2017 WL 1536234, at *4. At trial, as they do on appeal, Plaintiffs and the Bank offered distinct approaches to determining whether the Bank retained a profit as a result of the transfer of the beneficiaries' 401(k) Plan account balances to the Pension Plan.

6

On the one hand, Plaintiffs focused on the undisputed fact that the transferred 401(k) Plan balances were "pooled" or "commingled" with—rather than segregated from—the funds of the Pension Plan. *Id.* Plaintiffs argued that, as a matter of black-letter equity law, when improperly obtained funds are commingled with other funds, a plaintiff is entitled to a share of the returns on all of the commingled funds in proportion to the unlawfully obtained assets' share of the commingled fund as a whole. *Id.* To that end, one of Plaintiffs' experts, Lawrence Deutsch, calculated—and the Bank does not dispute—that the Pension Plan as a whole had a cumulative rate of return of 28.6% over the 1998 to 2009 period when the 401(k) Plan assets were pooled with the Pension Plan assets. *See id.* Allocating a proportionate share of the Pension Plan's retained profit based on that return rate to the 401(k) Plan participants who transferred their funds to the Pension Plan, Deutsch calculated that the Bank retained $379 million in profit, including accrued interest, from the unlawful transaction. *Id.* Although the Bank did not introduce its own analysis using Plaintiffs' proportionate-share-of-the-whole methodology, a Bank executive testified—in accordance with Deutsch's analysis—that the Pension Plan as a whole outperformed the beneficiaries' notional allocations during the relevant time period.

By contrast, the Bank asserted—and the district court found—that the Bank relied on a different, contemporaneously documented, "Investment Strategy" for the 401(k) balances transferred to the Pension Plan than for the remaining funds in the Pension Plan. *Id.* at *4, *8. In particular, "[t]he core of the [Pension] Plan's Investment Strategy was to invest the assets used to fund the [transferred 401(k) accounts] more heavily in equities than participants invested their hypothetical accounts, on the theory that equities would be

7

expected to outperform fixed income options over the long term. The [Pension] Plan did this by matching or 'hedging' participant equity investments with [Pension] Plan equity investments and investing approximately 60% of participant fixed income investments in equities." *Id.* at *5.

The Bank's expert, Dr. Russell Wermers, sought to determine whether the transferred balances returned a profit to the Bank under the Investment Strategy. To do so, Wermers analyzed the performance of three asset classes included in the Pension Plan's general investment portfolio: domestic equities, international equities, and fixed income assets. *Pender*, 2017 WL 1044965, at *7. Wermers used three benchmark indices to estimate the returns of those asset classes over the relevant time period—the Russell 3000 for domestic equities, the MSCI EAFE Index for non-U.S. equities, and the Lehman Brothers Aggregate Bond Index for fixed income assets. *Id.* Although the Pension Plan did not necessarily invest in these indices, the Investment Policy identified these indices as benchmarks for their respective asset classes, and directed the investment managers to "[e]qual or exceed the return of the benchmark, net of fees, at a comparable level of risk." J.A. 841.

Wermers found that the two equity indices (Russell 3000 and MSCI EAFE) declined during the relevant period, whereas the bond index increased by 81.1%. *Pender*, 2017 WL 1536234, at *7. Because (1) the Investment Strategy had the effect of overweighting equity investments by matching 401(k) Plan participants' equity allocations and treating their fixed income investments as part of the Pension Plan's general investment account and (2) equities performed worse than fixed income assets during the relevant time, Wermers

8

opined that the transfer strategy must have resulted in a loss to the Pension Plan—in the amount of the difference in performance between the Bank's (underperforming) allocation and the notional allocations by 401(k) Plan participants, which were less heavily weighted toward equities. *Id.*

In addition to Wermers' opinion, the Bank also introduced contemporaneously recorded and maintained spreadsheets, which, on an aggregate basis, tracked "participants' hypothetical equity and fixed income investments" and compared those returns to the returns realized by Pension Plan's Investment Strategy. *Id.* at *8. Based on these spreadsheets, a Bank executive responsible for monitoring the Pension Plan's investments, David Andreasen, calculated that the Investment Strategy of overweighting equity investments resulted in a net investment loss to the Bank. *Id.* In particular, Andreasen testified that the Investment Strategy for the transferred balances yielded a return of 3.5% over the relevant period, compared to a 16.5% aggregate return on Plaintiffs' notional investments, leading to a loss of $149 million. Put differently, Andreasen concluded that the Bank's investment allocation performed far worse than the beneficiaries' notional allocations. Adding the costs associated with the IRS closing (such as the IRS penalty and the costs of creating and transferring funds into the special purpose 401(k) plan), Andreasen testified that the transfer resulted in a cumulative loss of $272 million. *Id.*

Finding that "[b]oth the Plaintiffs['] and the Defendants['] experts . . . presented a coherent and facially plausible story for their parties" and none of their testimony was "contradicted by objective evidence," the district court nonetheless found that "Defendants' experts provided evidence at trial that is more credible than the testimony

9

provided by the Plaintiffs' experts." *Id.* at *4. In rendering this finding, the district court determined that Deutsch's approach was "not the appropriate measure of profits due to the transfer," because it focused on the performance of the Pension Plan as a whole, not profits on the transferred 401(k) balances attributable to the Investment Strategy. *Id.* at *12; *id.* at *13 ("The Bank's profit from the transfer (if any) is best measured using the returns from the Investment Strategy that the [Pension] Plan actually used to fund the [transferred 401(k) Plan balances].").  Put differently, the district court concluded that use of Plaintiffs' *pro rata* or "proportionate-share-of-the whole" approach "would be inappropriate because it would produce 'profits' having nothing to do with the transfers and therefore is contrary to the purpose of this inquiry." *Id.* at *18.

The district court further determined that "[t]he appropriate way to determine whether there was a profit retained as a result of its investment strategy applied to the transferred assets is to look at the returns *attributable* to that 'investment strategy.'" *Id.* (emphasis added) (internal quotation marks omitted); *see also id.* at *19 (stating that in assessing a claim for an accounting for profits a court must "'reach the best approximation it can under the circumstances' of the profit attributable to the conduct at issue" (quoting *Restatement (Third) of Restitution & Unjust Enrichment* § 51 cmt. g (2011))).  The court said it embraced the Bank's "attribution" approach because "Plaintiffs' use of total [Pension] Plan returns would confer an inappropriate windfall on participants, act as a penalty and otherwise be inequitable." *Id.* at *19.  Applying the Bank's attribution approach and crediting Wermers' and Andreasen's analyses, the district court held that the

Bank did not retain any profit as a result of the transfer and, therefore, dismissed Plaintiffs' claim for an accounting for profits as moot. *Id.* at \*23. Plaintiffs timely appealed.

II.

On appeal, Plaintiffs argue that the district court reversibly erred in relying on the Bank's Investment Strategy to determine whether the Bank profited from the unlawfully transferred funds—and therefore denying Plaintiffs equitable relief—rather than calculating all profits accruing to the Pension Plan during the course of the commingling of the funds and awarding Plaintiffs a proportionate share of those profits.[2] When, as here, a district court renders a decision after a bench trial, "we review the district court's factual findings for clear error and its legal conclusion de novo." *F.T.C. v. Ross*, 743 F.3d 886, 894 (4th Cir. 2014); *see also* Fed. R. Civ. P. 52. Likewise, we review a district court's decision to award or deny "equitable relief for abuse of discretion, accepting the court's factual findings absent clear error, while examining issues of law de novo." *Dixon v. Edwards*, 290 F.3d 699, 710 (4th Cir. 2002); *see also Griggs v. E.I. Du Pont de Nemours & Co.*, 237 F.3d 371, 385–86 (4th Cir. 2001) ("leav[ing] it to the sound discretion of the

---

[2] Plaintiffs further argue that this Court should direct the district court to conclude that Deutsch correctly determined the Bank's profit from the transaction and that the Bank is not entitled to seek certain set-offs from or assert equitable defenses to that determination. As detailed below, we conclude that the district court did not reversibly err in denying Plaintiffs equitable relief. Accordingly, we need not—and thus do not—address these additional arguments.

11

district court" to determine whether, and in what form, an award of equitable relief under Section 502(a)(3) was "appropriate").

To resolve Plaintiffs' appeal, we must address two questions: (A) whether the district court was *required* to follow Plaintiffs' proposed "proportionate-share-of-the-whole" approach and, if not, (B) whether the district court reversibly erred in relying on the Bank's attribution approach in determining that the Bank did not profit from the transfer.

A.

As to the first question, the proportionate-share-of-the-whole approach advanced by Plaintiffs finds substantial support in Restatements, treatises, and case law. For example, the *Restatement (First) of Trusts* provides that "[w]here the trustee wrongfully mingles trust property with his individual property in one indistinguishable mass" and "exchanges the mingled mass for other property" that "becomes more valuable than the mingled mass with which it is acquired, the beneficiary is entitled to a proportionate share of the property, and thus to secure the profit which arises from the transaction." *Restatement (First) of Trusts* § 202 cmt. h (1935); *see also Restatement (Second) of Trusts* § 202 (same); *Restatement (First) of Restitution* § 209 cmt. a (1937) ("The person whose money is wrongfully mingled with money of the wrongdoer does not thereby lose his interest in the money, although the identity of his money can no longer be shown, but he acquires an interest in the mingled fund. His interest is such that he is entitled in equity to claim *a proportionate share of the mingled fund* or a lien upon it." (emphasis added)); *id.* at § 210.

12

Likewise, authoritative legal commentators support the proportionate-share-of-the-whole approach. *See, e.g.*, 2 Dan B. Dobbs, Law of Remedies § 6.1(4), at 16–17 (2d ed. 1993) ("[W]hen the defendant uses the entire commingled fund to purchase property . . . the plaintiff is not entitled to a constructive trust on the entire property purchased, but he is entitled to a trust for a share in the property proportionate to his share in the fund."); Austin W. Scott, *The Right to Follow Money Wrongfully Mingled with Other Money*, 27 Harv. L. Rev. 125, 127 (1913) ("[W]here the claimant's money is mingled with that of the wrongdoer, and is therefore only partly instrumental in earning the profit[,] [t]he claimant should be entitled to a share of the profit, in so far as his property contributed to earning the profit.").

Both this Court and the Supreme Court also have endorsed use of the proportionate-share-of-the-whole approach to determine the profit obtained by a defendant as a result of its use of unlawfully commingled funds. *See, e.g.*, *Henkels v. Sutherland*, 271 U.S. 298, 302 (1926) ("Since the proceeds resulting from the sale of Henkels' property have been commingled with the proceeds of other sales and thus invested, an account must be taken to ascertain the average rate of interest received by the Treasury upon all the proceeds invested and thereupon . . . a proportionate allocation made in respect of the proceeds belong to Henkels for the period of their investment."); *MacBryde v. Burnett*, 132 F.2d 898, 900 (4th Cir. 1942) ("[I]f trust funds are mingled with personal funds of a trustee, the whole is impressed with a trust until separation of the trust property can be made, and that the trust [beneficiaries are] entitled to a proportionate part of the profits realized by the trustee in dealings with the fund in which the trust funds are mingled.").

13

And other circuits also have applied the proportionate-share-of-the-whole approach in such circumstances. *See, e.g.*, *Provencher v. Berman*, 699 F.2d 568, 570 (1st Cir. 1983) (Breyer, J.) (explaining that when "a 'conscious wrongdoer' . . . uses commingled funds to buy property, . . . the innocent party can choose either to enforce a lien on the property for the value of the estate's funds or" claim "the proportionate share of the real estate"); *Bartlett & Co., Grain v. Commodity Credit Corp.*, 307 F.2d 401, 409 (8th Cir. 1962) ("The amount of the actual yield of the bills is known, and the claim of Commodity for the period now in question should be limited to *its pro rata share of the yield*." (emphasis added)); *Bird v. Stein*, 258 F.2d 168, 177 (5th Cir. 1958) (Wisdom, J.); *Marcus v. Otis*, 169 F.2d 148, 150 (2d Cir. 1948) (A. Hand, J.) ("[W]here a wrongdoer mingles his own funds with other funds which he has misappropriated . . . he is liable only for a proportionate part of the profits realized based upon the ratio of the amount of money he misappropriated to the original commingled mass."). Additionally, at least one court has applied the proportionate-share-of-the-whole methodology in an analogous ERISA case. *Rochow v. Life Ins. Co. of N.A.*, 737 F.3d 415, 429–30 (6th Cir. 2013) (concluding that a district court did not abuse its discretion in ascertaining profits to be disgorged when unlawfully obtained funds were commingled with defendant's general assets by applying "the principle that where funds are not traceable, an appropriate remedy is to order disgorgement of a proportionate share of the wrongdoer's profits"), *rev'd on rehearing on other grounds* 780 F.3d 364 (6th Cir. 2015) (en banc).

Notwithstanding the proportionate-share-of-the-whole approach's widespread application, *see Provencher*, 699 F.2d at 570 (describing the proportionate-share-of-the-

14

whole approach as "virtually universal"), a few courts took—and continue to take—other approaches in determining whether, and to what extent, a defendant profited from the use of unlawfully obtained, and mingled, money, *see, e.g.*, *Parke v. First Reliance Standard Life Ins. Co.*, 368 F.3d 999, 1009 (8th Cir. 2004) (holding, in ERISA breach of fiduciary duty case, that the plaintiff was entitled to disgorgement of profits in the form of interest because the fiduciary "'gains' from the wrongful withholding of the plaintiff's benefits even if the plaintiff does not prove specific financial profit. In particular, the defendant receives a benefit from having control over the money"); *In re Mowrey's Estate*, 232 N.W.82, 86 (Iowa 1930) (requiring executor, who commingled estate funds with personal funds to obtain mortgages, to pay interest on commingled funds at the statutory rate).

That the proportionate-share-of-the-whole approach appears to have been widely, if not universally, embraced by courts and commentators does not necessarily mean, however, that the district court was *required* to follow that approach in this case—the question this Court must resolve. As to that question, Plaintiffs contend that the district court was required to apply the proportionate-share-of-the-whole approach in this case for two reasons.

First, Plaintiffs argue that "[b]ecause 'courts of equity must be governed by rules and precedents no less than courts of law,' . . . the Supreme Court has been insistent that any time equity has already developed a specific rule for dealing with a recurring fact pattern, equity courts are forbidden from 'exercis[ing] [their] background equitable powers' . . . to engage in '*ad hoc* equitable departures.'" Appellants' Br. 28 (second and

15

third alterations in original) (quoting *Lonchar v. Thomas*, 517 U.S. 314, 323–24, 327 (1996)). *Lonchar*, however, does not bear the weight Plaintiffs claim.

Without question, *Lonchar* supports the proposition that, for a variety of compelling reasons—predictability, uniformity, and fairness, to name a few—courts generally should follow equitable rules, like the proportionate-share-of-the-whole methodology. *Lonchar*, 517 U.S. at 324 ("[E]quitable rules that guide lower courts reduce uncertainty, avoid unfair surprise, minimize disparate treatment of similar cases, and thereby help all litigants."). But *Lonchar* dealt with a meaningfully distinct question—"whether a federal court may dismiss a first federal habeas petition for general 'equitable' reasons beyond those embodied in the relevant statutes, Federal Habeas Corpus Rules, and prior precedents." *Id.* at 316. That question turned on a complex regulatory and statutory scheme that specifically addressed the relevant issue and did not expressly confer equitable authority to resolve that question. *Id.* at 322–28.

By contrast, ERISA Section 502(a)(3), under which Plaintiffs seek relief, expressly empowers courts to invoke their equitable authority and determine whether equitable relief is "appropriate." 29 U.S.C. § 1132(a)(3). More significantly, the Supreme Court subsequently recognized that, notwithstanding *Lonchar*'s statement that courts of equity "must be governed by rules and precedents no less than the courts of law," the "exercise of a court's equity powers . . . *must be made on a case-by-case basis*." *Holland v. Florida*, 560 U.S. 631, 649–50 (2010) (emphasis added) (internal quotation marks omitted). "In emphasizing the need for flexibility and avoiding mechanical rules . . . we have followed a tradition in which courts of equity have sought to relieve hardships which, from time to

16

time, arise from a hard and fast adherence to more absolute legal rules, which, if strictly applied, threaten the evils of archaic rigidity." *Id.* at 650 (internal quotation marks omitted). Accordingly, neither *Lonchar* nor Supreme Court precedent *requires* courts to invariably follow equitable rules.

Second, Plaintiffs argue that even if district courts generally retain discretion as to the application of equitable rules, ERISA Section 502(a)(3) does not afford district courts any such discretion. Appellants' Br. 30–31. In support of their position, Plaintiffs emphasize this Court's holding in *Pender* that "[t]he Supreme Court has interpreted the term 'appropriate equitable relief,' as used in Section 502(a)(3), to refer to 'those categories of relief that, traditionally speaking (*i.e.*, prior to the merger of law and equity [in 1938]) were *typically* available in equity.'" *Pender*, 788 F.3d at 364 (quoting *CIGNA Corp. v. Amara*, 563 U.S. 421, 439 (2011)). As detailed above, Plaintiffs are correct that their proportionate-share-of-the-whole approach appears to have been the predominant way of conducting an accounting of profits when unlawfully obtained funds were commingled with other funds. But the language from *Amara* upon which *Pender* relied dealt with what *forms* of "equitable relief" were available—*e.g.*, restitution, disgorgement, accounting for profits, etc.—not with whether a court was *required* to award a particular form of relief— or calculate such relief in a particular way—the relevant question here.

Both the language of the statute and case law contradict Plaintiffs' claim that "courts in ERISA cases *cannot* rely on their judgment to devise relief that is fair, reasonable, and 'equitable' in the particular circumstances of the case." Appellants' Br. 30–31 (emphasis in original). To begin, whereas *Pender*, and the Supreme Court cases upon which it relied,

17

focused on the meaning of "equitable relief" in Section 502(a)(3), 788 F.3d at 364, that provision also requires that the award of such relief be "appropriate," indicating that a court has the power to deny such relief (even if it is a *form* of equitable relief available under Section 502(a)(3)), if it deems such relief not "appropriate" under the particular facts of the case. To that end, after concluding that the remedies sought in *Amara* were "equitable relief," the Supreme Court remanded the case because it was unclear "whether the District Court will find it *appropriate* to exercise its *discretion* under § 502(a)(3) to impose that remedy on remand." *Amara*, 563 U.S. at 442 (emphasis added).

Likewise, in *Griggs v. E.I. DuPont de Nemours & Co.*, this Court held that "even if the redress sought by a beneficiary under ERISA Section 502(a)(3) is a classic form of equitable relief, it must be *appropriate* under the circumstances." 237 F.3d at 385 (emphasis retained). And in *McCravy v. Metropolitan Life Insurance Co.*, this Court considered whether a breach of fiduciary action seeking equitable relief in the form of estoppel and surcharge was available under ERISA Section 502(a)(3). 690 F.3d 176, 182 (4th Cir. 2012). After concluding that estoppel and surcharge actions were "traditionally available in [pre-merger] courts of equity"—and therefore available under Section 502(a)(3)—we remanded the case to the district court, stating: "Whether [the plaintiff's] breach of fiduciary duty claim will ultimately succeed and whether surcharge is an *appropriate* remedy under Section [502(a)(3)] *in the circumstances of this case* are questions appropriately resolved in the first instance before the district court." *Id.* at 180–82 (emphasis added). Accordingly, this Court has held that even if a form of equitable

18

relief is available under Section 502(a)(3), a district court has discretion to deny such relief if the court deems such relief inappropriate under the particular facts of the case.

Other circuit courts have reached the same conclusion. For example, the Third Circuit held that "the term 'appropriate' . . . confer[s] discretion on district courts, sitting as courts of equity, to limit equitable relief by doctrines and defenses traditionally available at equity." *Nat'l Sec. Sys., Inc. v. Iola*, 700 F.3d 65, 101–02 (3d Cir. 2012). Applying that rule, the Third Circuit upheld a district court's award of only *partial* disgorgement, notwithstanding that the traditional equitable rule afforded full disgorgement, because some of the unlawful payments at issue had been passed on to innocent third-parties. *Id.* The *National Security Systems* court ruled that because courts sitting in equity are entitled "to fashion relief tailored to the unique circumstances of a case," the district court did not abuse its discretion in limiting the disgorgement when it found that the facts of the case so warranted. *Id.* at 102.

Likewise, the Seventh Circuit has explained that "the fact that a transaction is prohibited under ERISA *does not necessarily mandate a remedy*, although it is a very dangerous area for trustees to explore, let alone attempt to exploit." *Etter v. J. Pease Constr. Co., Inc.*, 963 F.2d 1005, 1009 (7th Cir. 1992) (emphasis added). "Rather, the decision to impose a remedy lies within the court's discretion and should be in tune with the case's realities." *Id.* (internal quotation marks omitted); *see also Gearlds v. Entergy Servs., Inc.*, 709 F.3d 448, 452 (5th Cir. 2013) ("We leave to the district court the determination whether Gearlds's breach of fiduciary duty claim may prevail on the merits and whether the *circumstances of the case* warrant the relief of surcharge." (emphasis

19

added)); *McDonald v. Pension Plan of NYSA-ILA Pension Tr. Fund*, 320 F.3d 151, 161 (2d Cir. 2003) ("[Section 502(a)(3)] does not require district courts to grant particular relief; rather, it affords district courts the discretion to fashion appropriate equitable relief."). By contrast, Plaintiffs cite no authority, nor have we found any, holding that a district court is barred from declining to award equitable relief under Section 502(a)(3)—even if the requested form of equitable relief is available under that statute—if it determines the award of such relief would be inappropriate under the facts of the case.

Accordingly, ERISA Section 502(a)(3) did not *require* the district court to award Plaintiffs relief based on the proportionate-share-of-the-whole methodology. Rather, the district court retained discretion to consider other approaches in determining whether equitable relief was "appropriate" under the particular facts of the case.

B.

Having concluded that the district court was not required to follow the proportionate-share-of-the-whole approach in determining whether, and to what extent, the Bank profited from the unlawful transfers, we next must decide whether the district court permissibly exercised its discretion in determining equitable relief was not appropriate in this case. Under the governing deferential standard of review, we uphold the district court's decision denying Plaintiffs equitable relief.

The district court's decision rested on extensive factual findings, none of which Plaintiffs challenge on appeal as clearly erroneous. Those factual findings reflect contemporaneous Bank records maintained in the ordinary course of business outlining the Bank's Investment Strategy, which the district court found treated the transferred 401(k)

20

balances differently than the other funds in the Pension Plan's general account. *Pender*, 2017 WL 1536234, at \*8. The district court further found that the contemporaneously documented Investment Strategy, to which the Bank adhered, required the Pension Plan "to invest assets to fund [the transferred 401(k) account balances] in a higher concentration of equities than participants invested their hypothetical accounts." *Id.* at \*9. The district court also found that the Bank contemporaneously tracked, on a monthly basis, the performance of the transferred 401(k) balances, separate and apart from the performance of the remaining funds in the Pension Plan's general account. *Id.* at \*8, \*13. And the district court found—and Plaintiffs do not dispute—that the returns for the transferred 401(k) balances realized under "the Investment Strategy were . . . less than participants' hypothetical returns." *Id.* at \*9.

Based on these undisputed factual findings, the district court repeatedly asserted it would not be "appropriate" to award Plaintiffs equitable relief under the proportionate-share-of-the-whole approach because that approach would not measure whether any profits accrued to the Bank "due to the transfer." *Id.* at \*12; *see also, e.g.*, *id.* at \*5 ("[A]s a matter of equity, the Court finds that [the proportionate-share-of-the-whole] methodology is inappropriate and inferior to calculating profit based on the actual Investment Strategy utilized with respect to the [transferred funds]."); *id.* at \*18–19. Again emphasizing the distinct, contemporaneously documented Investment Strategy for the transferred funds, the district court further determined it would be inappropriate to apply the proportionate-share-of-the-whole approach because "doing so would have the effect of being a penalty, and, conversely, would create a windfall for Plaintiffs, because much of what would be captured

21

as 'profits' under such a methodology would be investment returns the Plan would have realized in any event regardless of the transfer." *Id.* at \*14.

It was within the district court's discretion to determine that awarding Plaintiffs equitable relief using the proportionate-share-of-the-whole methodology would be inappropriate *in this case*. The proportionate-share-of-the-whole approach was designed to address situations in which a defendant mingles unlawfully obtained funds with money of his own so that the "whole forms one indistinguishable mass[;] . . . it can no longer be identified." Scott, *supra* at 125.

Here, the district court did not clearly err in determining that the extensive contemporaneous evidence outlining the Investment Strategy for the unlawfully transferred funds and separately tracking the performance of the funds invested under that strategy made it possible to "identif[y]" the performance of the unlawfully mingled funds, *id.*, thereby rendering application of the proportionate-share-of-the-whole methodology inappropriate in this particular case, *cf. Sheldon v. Metro-Goldwyn Pictures Corp.*, 309 U.S. 390, 406 (1940) ("Where there is a commingling of gains, [the wrongdoer] must abide the consequences [and disgorge all commingled gains], *unless he can make a separation of the profits* so as to assure the injured party all that justly belongs to him." (emphasis added)). Put differently, the extensive contemporaneous evidence identifying the performance of the unlawfully commingled funds provided the district court with an adequate factual basis to deviate from the proportionate-share-of-the-whole methodology, which courts widely apply to assess whether, and to what extent, a wrongdoer profits from unlawfully commingled funds.

22

Likewise, courts and commentators have cautioned against awarding a plaintiff equitable relief, and disgorged profits in particular, to the extent doing so would amount to a windfall or penalize a defendant. *Id.* at 404, 408 (explaining that "[e]quity is concerned with making a fair apportionment so that neither party will have what justly belongs to the other" and therefore does not permit "inflict[ing] an unauthorized penalty"); *Griggs*, 237 F.3d 371, 385 (4th Cir. 2001) (stating that an ERISA plaintiff seeking equitable relief was "not entitled to a windfall"); *Restatement (Third) of Restitution and Unjust Enrichment* § 51 (2011) ("[T]he unjust enrichment of a conscious wrongdoer . . . is the net profit attributable to the underlying wrong. The object of restitution in such cases is to eliminate profit from wrongdoing while avoiding, so far as possible, the imposition of a penalty."); 1 Dobbs, *supra* § 4.5(3), at 642 ("Even the willful wrongdoer should not be made to give up that which is his own; the principle is disgorgement, not plunder."). In light of these authorities, which the district court explicitly referenced, the district court did not abuse its discretion in determining that use of the proportionate-share-of-the-whole methodology to award Plaintiffs equitable relief would amount, *in this specific case*, to a windfall to Plaintiffs, and inappropriately penalize the Bank. *Pender*, 2017 WL 1536234, at *14, *16, *19. In particular, there is no dispute that as a result of the transfers and payments required by the IRS closing agreement, Plaintiffs' current 401(k) account balances are at least as large as they would have been had the funds in their accounts actually been invested in accordance with their notional allocations. *Pender*, 2013 WL 4495153, at *10. And the contemporaneous records introduced by the Bank, which separately tracked the performance of the transferred funds, provided the district court with a factual basis to

23

determine that the Bank did not profit from the transaction and that any further payment to Plaintiffs would serve only to penalize the Bank.

The extensive evidence of the distinct, contemporaneously documented Investment Strategy credited by the district court sets this case apart from the "hypothetical example" set forth by our colleague in dissent. *See post* at 27–28. Under that example, "the investor never explains how he could maintain a separate investment strategy that benefits only his share of the commingled funds." *Id.* But the district court credited the Bank's evidence documenting the separate investment strategy and establishing that the returns accruing the unlawfully commingled funds invested pursuant to that strategy could be separately tracked. Plaintiffs have not challenged those factual findings as clearly erroneous, and therefore we have no basis to conclude that the district court abused its discretion in relying on those findings to deny Plaintiffs equitable relief.

That we conclude that the district court did not abuse its discretion in determining that equitable relief was not appropriate *in this case* does not mean that we necessarily would have rendered the same judgment were we addressing the question in the first instance. Having access to the additional funds obtained through the unlawful transfers may have impacted the Bank's investment strategy for the Pension Plan as whole, even if it sought to hedge its risk by mirroring the 401(k) beneficiaries' equity investments, meaning that the benefits accruing to the Pension Plan may not have been entirely independent of the losses related to the 401(k) balances, as the attribution approach assumed. Additionally, as the Eighth Circuit recognized, a "defendant receives a benefit from having control over the money" even if a profit cannot be demonstrated. *Parke*, 368

24

F.3d at 1009. And the attribution approach advanced by the Bank, and relied on by the district court, is generally applied in situations when a defendant's skill or ingenuity independently contributed to profits obtained, in part, by a defendant's unlawful use of another's property. *See, e.g.*, *Sheldon v. Metro-Goldwyn Pictures Corp.*, 309 U.S. at 404–08. By contrast, here the Bank maintains that its *lack of skill* in investing the transferred funds—as evidenced by the Bank's Investment Strategy yielding significantly lower returns than Plaintiffs' notional allocations—warranted application of the attribution approach.

Nonetheless, in light of the extensive contemporaneous records documenting the Investment Strategy for the transferred funds and tracking the performance of those funds—which provided the district court with an adequate factual basis to find that the performance of the transferred funds could be separately identified—it was within the district court's discretion to decline to award equitable relief based on the proportionate-share-of-the-whole approach.

In affirming the district court's exercise of its discretion, we do not—as our dissenting colleague suggests—"depart" from our prior holding that if "'Section 204(g)(1)[] . . . is to have any teeth, the available remedies must be able to reach situations like the one this case presents, i.e., where a plan sponsor benefits from an ERISA violation, but plan participants—perhaps through luck or agency intervention—suffer no monetary loss.'" *Post* at 29 (quoting *Pender*, 788 F.3d at 358, 364-65). On the contrary, we simply determine that the district court did not *clearly err* in finding that—based on the contemporaneous records documenting the Investment Strategy for the transferred funds

25

and tracking the performance of those funds—the Bank did not benefit from the violation. In determining that the district court did not clearly err, we in no way retreat from this Court's previous holding that Section 502(a)(3) entitles plan participants to an accounting for profits attributable to an ERISA violation, even if the participants suffered no monetary harm from the violation. ERISA does not allow a plan sponsor to wrongfully use plan participant funds for the sponsor's benefit. In such circumstances, the plan sponsor must disgorge its ill-gotten benefit to plan participants.

## III.

For the foregoing reasons, we affirm the judgment of the district court.

*AFFIRMED*

BARBARA MILANO KEENAN, Circuit Judge, dissenting:

I agree with the majority that a court examining an ERISA violation is not *required* to apply a proportionate-share-of-the-whole approach when a wrongdoer has profited from the use of commingled funds. A court's exercise of its equitable powers must be made on a fact-specific basis, rather than by imposing absolute outcomes without regard to factual context. *See Holland v. Florida*, 560 U.S. 631, 649-50 (2010); *see also* 29 U.S.C. § 1132(a)(3) (allowing participant to bring claim for "appropriate equitable relief"). However, based on the Bank's particular conduct here, I depart from the majority's holding allowing the Bank to profit by using the plaintiffs' money for the Bank's own purposes. In my view, the district court plainly abused its discretion in permitting the Bank to profit from its own misconduct, which even the Bank concedes was illegal.

A simple example easily illustrates the Bank's self-dealing logic, which the majority accepts today. Imagine that you agree to give $100 to an investor who holds $900 of other funds, so that he can invest the commingled funds of $1,000 and guarantee you a *minimum* return on your investment of 5%. When the $1,000 in commingled funds yields an overall 25% gain, for a total of $1,250, you naturally expect to earn $25 in profit on your investment of $100, yielding a total payment to you of $125.

To your dismay, however, the investor pays you only the guaranteed $105. He tells you that, unfortunately, his investment strategy with respect to *your* $100 share of the single pot of commingled funds failed miserably in the market, causing him to suffer a loss of 10% on your $100 investment. And, astoundingly, he says that he is entitled to all the remaining profit from using your commingled funds because his *separate* strategy for the

27

other commingled funds in the single pot was far more successful. Remarkably as well, the investor never explains how he could maintain a *separate* investment strategy that benefits only his share of the commingled funds, but not yours. Instead, the investor, who is far more sophisticated and powerful in the marketplace than you are, simply tells you how fortunate you are to have received the guaranteed 5% gain, declares victory, and pockets the entire remaining profit from investing the commingled funds.

This hypothetical example captures the essence of the Bank's wrongdoing and windfall in this case.[3] Thus, the example illustrates the fallacy of the district court's reasoning when it rejected the proportionate-share-of-the-whole approach, a longstanding equitable principle. As we explained in the context of a trust in *MacBryde v. Burnett*, 132 F.2d 898 (4th Cir. 1942), when "funds are mingled with personal funds of a trustee, the whole is impressed with a trust until separation of the trust property can be made," and the beneficiaries ordinarily should receive "a proportionate part of the profits realized." *Id.* at 900.

When there has been commingling of funds by a wrongdoer, most courts have applied the proportionate-share-of-the-whole approach when formulating appropriate equitable relief. *See Henkels v. Sutherland*, 271 U.S. 298, 302 (1926); *Provencher v.*

---

[3] I recognize that the plaintiffs here were informed prior to the transfer that they would earn either the greater of their hypothetical investments or the original balance of their transferred assets. But this initial expectation does not bear on fashioning a remedy for the Bank's wrongdoing. The issue before us is whether the district court abused its discretion in rejecting the plaintiffs' request for disgorgement of the Bank's profits obtained from using the plaintiffs' assets.

28

*Berman*, 699 F.2d 568, 570 (1st Cir. 1983); *Bartlett & Co., Grain v. Commodity Credit Corp.*, 307 F.2d 401, 409 (8th Cir. 1962); *Marcus v. Otis*, 169 F.2d 148, 150 (2d Cir. 1948). And, as the majority observes, the Sixth Circuit has applied this approach in the context of an ERISA violation involving commingled funds. *Rochow v. Life Ins. Co. of N. Am.*, 737 F.3d 415, 429-30 (6th Cir. 2013), *rev'd on rehearing on other grounds,* 780 F.3d 364 (6th Cir. 2015) (en banc). Nevertheless, in the face of this compelling case law and our own decision in *MacBryde*, the majority swims against the strong tide of equity.

In our previous decision in this case, we remanded the matter for the district court to consider the plaintiffs' claim under ERISA Section 502(a)(3) for an accounting of profits after the Bank unlawfully transferred the plaintiffs' 401(k) Plan investments (the transferred assets) into the Bank's Pension Plan. *Pender v. Bank of Am. Corp.*, 788 F.3d 354, 358, 364-65 (4th Cir. 2015). We explained that in filing suit against the Bank, the plaintiffs sought "profits generated using assets that belonged to them," reduced by the amount the Bank already had paid the plaintiffs pursuant to the IRS settlement. *Id.* at 364. And, importantly, we emphasized that if "Section 204(g)(1)[ ] . . . is to have any teeth, the available remedies must be able to reach situations like the one this case presents, i.e., where a plan sponsor benefits from an ERISA violation, but plan participants—perhaps through luck or agency intervention—suffer no monetary loss." *Id.* at 365. It seems that the majority now has departed from our prior admonition.

Somehow, the Bank convinced the district court on remand that the plaintiffs were lucky to have been paid anything, because the Bank's "investment strategy" with respect to the plaintiffs' portion of the commingled funds had failed. However, the strategy only

failed with respect to *amounts equal to* the transferred assets. *See Nickel v. Bank of Am. Nat'l Trust & Sav. Ass'n*, 290 F.3d 1134, 1138 (9th Cir. 2002) (discussing disgorgement and stating that "[m]oney is fungible. Once in the bank's accounts . . . the specific sums taken from the trusts could never be identified again."). The undisputed evidence showed that nearly $3 billion of transferred assets were pooled, indistinguishably, with the Pension Plan assets into one "pot" worth about $9 billion. And this "pot" profited by a margin of 28.6% during the relevant period, despite one failed aspect of the overall investment strategy.

Under its strategy, the Bank had intended to enhance the Plan's "pot" by investing amounts equal to the transferred assets more heavily in equities than the plaintiffs themselves would have invested. In that case, the Bank would pay the plaintiffs guaranteed minimum investment earnings, and pocket the additional earnings. *See Pender*, 788 F.3d at 358-59. Because the equities failed to perform as expected, the Bank claimed that the plaintiffs' portion of the commingled funds had shrunk, even though the "pot" actually profited by about $379 million, including accrued interest.

In concluding that these profits from the commingled funds were not attributable to the Bank's "transfer strategy," the district court answered the wrong question. *See Pender v. Bank of Am. Corp.*, No. 3:05-CV-00238, 2017 WL 1536234, at *4 (W.D.N.C. Apr. 27, 2017). The court should have focused instead on the question articulated in *MacBryde*, namely, what was the proportionate share of the profits made by investing the plaintiffs' portion of the funds. 132 F.2d at 900.

30

Although the district court appeared to couch its decision as a credibility determination, *Pender*, 2017 WL 1536234, at *4, in reality, the decision merely reflected the court's rejection of an established equitable remedy in favor of preserving the Bank's profit margin. Accordingly, we are not presented with an issue of competing facts that we review for clear error. *See Dixon v. Edwards*, 290 F.3d 699, 710 (4th Cir. 2002) (reviewing a district court's award of equitable relief for abuse of discretion and findings of fact for clear error). Moreover, "even if a district court applies the correct legal principles to adequately supported facts, the discretion of the trial court is not boundless and subject to automatic affirmance," when we have "a definite and firm conviction that the court below committed a clear error of judgment" in its conclusion. *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999); *see Huskey v. Ethicon, Inc.*, 848 F.3d 151, 158 (4th Cir. 2017). In my view, the district court committed a clear error of judgment and abused its discretion in refusing to order the Bank to disgorge the wrongful gains the Bank reaped.

As we explained in our prior decision, "ERISA borrows heavily from the language and the law of trusts." *Pender*, 788 F.3d at 367. And, under those principles, the Bank should be required to pay the plaintiffs the profits "which in equity and good conscience belonged" to the plaintiffs, rather than to use those profits to enhance the Bank's bottom line. *See id.* at 364 (quoting 1 D. Dobbs, Law of Remedies § 4.3(5), p. 608 (2d ed. 1993)). Therefore, I cannot abide the decision by the district court and the majority to allow the Bank to profit lavishly from its wrongful use of the plaintiffs' money.